Pre-Mixed Concrete, Inc., et al. [1] v. Commissioner. Pre-Mixed Concrete, Inc. v. Commissioner
Docket Nos. 83536-83539.
United States Tax Court
T.C. Memo 1962-301; 1962 Tax Ct. Memo LEXIS 8; 21 T.C.M. (CCH) 1601; T.C.M. (RIA) 62301; December 26, 1962
Robert C. Foulston, Esq., Donald L. Cordes, Esq., and Lester M. Fleming, Esq., 110 E. First, Wichita, Kan., for the petitioners. Donald L. Sturm, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent found deficiencies in petitioners income tax returns for the years and in the amounts as follows: Pre-Mixed Concrete, Inc.
Docket No. 83536
Year Ended
Deficiency
2-29-56
$5,500.00
Quality Concrete, Inc.
Docket No. 83537
2-29-56
$3,810.25
Airway Concrete, Inc.
Docket No. 83538
2-29-56
$9,817.95
Speedy-Mix Concrete, Inc.
Docket No. 83539
4-30-56
$1,306.96
Part of the deficiency against Airway Concrete, Inc., arose out of an adjustment by the respondent of the useful life of certain depreciable assets. This issue has been conceded by the petitioner and is no longer in controversy. The sole question for decision is whether each petitioner is entitled to a surtax exemption as provided by *10 section 11(c) of the 1954 Code. Findings of Fact Some of the facts have been stipulated and are hereby found as stipulated. The petitioner, Pre-Mixed Concrete, Inc., (hereinafter sometimes referred to as Pre-Mixed) is a corporation located at 200 West 10th Street, Wichita, Kansas. Petitioner, Speedy-Mix Concrete, Inc. (hereinafter sometimes referred to as Speedy-Mix), is a corporation located at 45th and Rock Road Streets, Sedgwick County, Kansas. Petitioner, Quality Concrete, Inc., (hereinafter sometimes referred to as Quality) is a corporation located at Highway K-15 and Hamilton Road, Wichita, Kansas. Petitioner, Airway Concrete, Inc., (hereinafter referred to as Airway) is a corporation located at 2800 South West Street, Wichita, Kansas. For the fiscal year ended February 29, 1956, Quality, Pre-Mixed, and Airway filed their Federal income tax returns with the district director of internal revenue for the district of Kansas. For its fiscal year ended April 30, 1956, Speedy-Mix filed its Federal income tax return with the district director of internal revenue for the district of Kansas. Hale D. Ritchie (hereinafter referred to as Hale), John P. Ritchie (hereinafter referred *11 to as John), and Evan D. Ritchie (hereinafter referred to as Evan) are brothers. A number of years ago, their father, H. T. Ritchie (hereinafter referred to as H. T.), moved to Wichita, Kansas, and started a street and road construction business. H. T. operated the business as a sole proprietorship until John joined the company. At that time, the name of the business was changed to H. T. Ritchie and Son. In 1945, John, Hale and Evan formed Ritchie Brothers Construction Company (hereinafter referred to as Ritchie Construction), a partnership, which was the successor to H. T. Ritchie and Son. At that time, H. T. withdrew from the business completely. In April 1947, the Ritchie brothers purchased a concrete manufacturing company from the estate of W. H. Allen. The company was subsequently incorporated under the name Allen's, Inc. (hereinafter referred to as Allen's). Allen's business consisted of selling ready-mixed concrete. The equipment included in the purchase of Allen's was a concrete batching plant, [2] an office building, railroad sidings and several concrete delivery trucks. The location of the business was and still is at 200 West Tenth Street, Wichita, Kansas. *12 Sometime after Allen's was acquired, a portable cement mixing operation was set up in the northeast section of Wichita. Subsequently, in the early part of 1952, Allen's built another batching plant in the southeast part of Wichita. Petitioners were all organized under the laws of Kansas by Hale, John and Evan. They contributed all the capital, constituted the board of directors, and owned, equally, the stock of each petitioner. Hale was the president, John was vice president and Evan was secretary and treasurer of each corporation. The following schedule shows the date each corporation was organized, its authorized capital, and the number of shares authorized and issued: No. of Shares
Date
Authorized
Authorized
Shares
Corporation
Organized
Capital $100 Par Value
Issued
Pre-Mixed
9-22-53
$15,000
150
150
Quality
9-22-53
15,000
150
150
Speedy-Mix
5-21-54
15,000
150
150
Airway
11-15-54
24,000
240
120
On October 1, 1953, Pre-Mixed purchased from Allen's a cement batching plant and related equipment for $30,000. The plant was located at 200 West Tenth Street and was the same one that Allen's had originally purchased from *13 the W. H. Allen estate. Pre-Mixed also purchased materials consisting of cement, rock, sand, chatt, pozzolith, and calcium chloride for $13,831.85. Pre-Mixed obtained a loan of $49,000 from H.T., on a written, unsecured promissory note dated October 1, 1953, to be payable on demand bearing interest at the rate of four percent. On October 1, 1953, Quality purchased a cement batching plant and related equipment from Allen's for $75,852.95. This was the same plant that Allen's had erected in the southeast section of Wichita in 1952. Quality also purchased materials consisting of cement, rock, sand, chatt, pozzolith, diesel fuel and furnace oil for $6,837.89. Quality obtained a loan of $61,000 from H.T. on a written, unsecured promissory note dated October 1, 1953, payable on demand and bearing interest at the rate of four percent. Quality also obtained a loan of $27,000 from Ritchie Construction on a written, unsecured promissory note dated October 1, 1953, payable on demand and bearing interest at the rate of four percent. On June 1, 1954, Speedy-Mix purchased equipment from Allen's for $6,523.53. On the same date, Speedy-Mix also purchased equipment from Ritchie Corporation for *14 $6,574.45. The equipment consisted of the portable cement mixing equipment which had previously been used by Allen's and Ritchie Construction. Subsequently, Speedy-Mix purchased additional equipment from Builders, Incorporated. A batching plant and related equipment was obtained by Airway in the latter months of 1954 and the early months of 1955. This plant was constructed and was not purchased intact. The materials from which the plant was constructed were purchased by Airway from Bublitz Machinery Co. (hereinafter referred to as Bublitz) and other companies not controlled by the Ritchie brothers. Airway's plant was never owned or operated by Allen's. Each petitioner had its plant located in a different part of Wichita. Airway's plant was located in the southwest part, while Quality was located in the southeast section. Pre-Mixed was located in the northwest section of Wichita, while Speedy-Mix was located in the northeast part. The plants were located in different parts of the city to take advantage of its growth. There was a vigorous union movement in Wichita during the period petitioners were organized. In November of 1953, the city of Wichita experienced a violent taxicab *15 strike which attracted national publicity. The union involved was the Teamsters, which was the most active one in the area. The Teamsters' jurisdiction included truck drivers. In 1953, the only ready-mixed concrete companies located in Wichita were Allen's, the Walt Keeler Company (hereinafter referred to as Keeler), and Dolese Brothers (hereinafter referred to as Dolese). In the spring of 1952, Keeler was struck by the union, and sometime before the incorporation of Pre-Mixed, the same occurred to Dolese. The Keeler strike lasted approximately two months while the one at Dolese lasted approximately half a day. The employees of both Keeler and Dolese were finally unionized. Allen's principal customers were the home builders and Ritchie Construction. Neither Ritchie Construction nor any of the home builders in Wichita were unionized. Ritchie Construction wished to avoid unionization and to avoid dealing with companies who were unionized. In the street construction business there is generally a great deal of pressure on the company to finish a job as soon as possible. Once the work is started there is a need for a constant source of concrete. If Ritchie Construction were forced *16 to deal with a unionized company, there was always the possibility that this source of supply would be cut off by a strike. If Ritchie Construction itself were unionized, the same difficulty could arise. In either event, their business would be adversely affected. The home builders also wanted to avoid unionization, if possible, because it tended to increase the cost of building a house. As long as the home builders were nonunion a carpenter could be employed not only to do carpentry work but to do such things as help lay out a house, help dig the footing, and sweep the house before the painters arrived. This was not possible where a union was involved because the union required a division of functions and a classification of workers. The home builders also wanted to avoid dealing with unionized concrete companies. The reason for this was that union truck drivers would attempt to organize the nonunion help when deliveries were made. Some of the home builders discussed the possibility of not having a nonunion source of concrete. They decided that if such an event were to occur, they would probably build a plant of their own. Prior to their unionization, both Keeler and Dolese *17 had had business with the home builders. After Keeler and Dolese were unionized, Allen's found itself in a unique position. In 1953, Allen's was the only nonunion ready-mixed concrete company located in the city of Wichita. Because of the home builders' attitude toward unions, Allen's had, in a sense, a large captive business. Under the circumstances as they existed, the Ritchie brothers believed that Allen's would probably be the next target for the union. Realizing that Allen's competitive edge would be destroyed if it were unionized, the Ritchie brothers decided to take steps to avoid unionization or to make it as difficult as possible. It was to effectuate this goal that the Ritchie brothers decided to form petitioners. It was intended that petitioners own the concrete plants but were to own no trucks. Allen's was to be the selling agent for petitioners. It was to be the owner of the concrete delivery trucks but was to own no plants. By separating the truck drivers from the other employees, the Ritchie brothers believed that they would have a better chance of fighting the unions. If there was only one corporation involved, an organizational strike would stop all business. However, *18 by using Allen's as the selling corporation and as the owner of the delivery trucks and by using petitioners as the manufacturers, then a strike by the drivers would not necessarily halt all operations. The Ritchie brothers believed that they could rent trucks to continue the operations of petitioners if Allen's was tied up by a strike. Subsequently, the Ritchie brothers' apprehensions about the union became a reality. In 1957, the Teamsters sought recognition as the bargaining representatives of Allen's truck drivers. A petition was filed with the National Labor Relations Board (hereinafter referred to as the N.L.R.B.) for an election. Allen's contested the N.L.R.B.'s jurisdiction to hold the election. Allen's maintained that it did not have a sufficient volume of interstate business. The Teamsters contended that Allen's together with nine [3] other Ritchie companies constituted a single employer which met the N.L.R.B.'s "indirect outflow" test. *19 On May 15, 1958, the N.L.R.B. decided that Allen's and the nine other Ritchie companies constituted a single employer which met the "indirect outflow" test. Allen's, Inc., 120 N.L.R.B. 1021 (1958). The N.L.R.B. directed that an election be held. After the N.L.R.B.'s decision, the Teamsters withdrew their petition for election. Consequently, no election was ever held. At the present time, petitioners, Allen's, and Ritchie Construction have not been unionized. None of the petitioners owned delivery trucks during 1953, 1954, 1955 and 1956 nor did they employ any truck drivers. During 1954, 1955 and 1956 Allen's owned delivery trucks and employed truck drivers, though not having any cement batching plant facilities. Each of the petitioners had a telephone but numbers were not listed in the telephone directory. During 1954, 1955 and 1956 there were mobile telephone units in all the trucks owned by Allen's and in petitioners' plants. The mobile telephone equipment was controlled in Allen's office. Orders for concrete were distributed from this office. Allen's was the sales corporation. When an order for concrete was received, Allen's telephoned or radioed the petitioner *20 nearest to the customer that a truck was coming. The dispatcher gave the batch man the name of the customer, the address and the amount and mix of concrete to be delivered. The sales between Allen's and the petitioners were at predetermined fixed prices. The prices were never averaged at the month's or year's end. There are probably at least 15 different mixes of concrete. The prices of each are based upon the cost of materials, plus a markup for labor, overhead and profit. These prices were subject to change from time to time as the cost of materials, freight rates, labor, etc., changed. Sales tickets were made out daily. When one of the petitioners received an order, a sale or delivery ticket was made out showing the name of the customer, the address, and the amount and kind of mix of concrete delivered. The next day all of the tickets came& into the offices of Allen's. Each ticket had a symbol or letter which identified the petitioner from whom the concrete was purchased. Thus, if the ticket has an "A" on it, the bookkeeper knew that Airway made the sale. These tickets were all numbered so the bookkeeper could account for all tickets. The bookkeeper then segregated the tickets *21 and made the entries showing what was purchased from each petitioner. Allen's paid the petitioners for the concrete purchased on a monthly basis. The payments were actually made by check and not by mere bookkeeping entries. None of the petitioners maintained an office or clerical staff during 1954, 1955 and 1956. All bookkeeping was done by Allen's at 200 West 10th Street. Allen's charged the petitioners for the bookkeeping services on a monthly basis. The bookkeeping charge made by Allen's to each of the petitioners is based on what Hale and Paul Spears, Allen's office manager and accountant, agreed upon as a fair and reasonable charge. There was no relationship between the amount of income earned and the amount of bookkeeping charged. Each of the petitioners kept separate books. Each of the petitioners bought its own materials and paid for them itself. Each of the petitioners maintained a separate bank account, and each maintained a separate payroll record. The sales of Allen's from the year ended January 1952 to the year ended January 31, 1960, as stated on the returns filed, are shown by the following table: CONCRETE SALES IN DOLLARS
Year
Outside
Ritchie Bros.
Material
Ended
Business
Const. Co.
Sales
Total Sales
1-31-52
$ 620,307.05
$295,453.53
$ 86,574.55
$1,002,335.13
1-31-53
812,119.57
431,897.51
73,717.49
1,317,734.57
1-31-54
1,009,317.52
520,266.65
109,017.08
1,638,601.25
1-31-55
1,453,525.59
439,887.05
138,654.75
2,032,067.39
1-31-56
1,308,393.42
483,926.34
125,747.24
1,918,067.01
1-31-57
1,226,210.12
660,266.99
127,218.18
2,013,695.29
1-31-58
961,765.53
473,705.41
135,949.05
1,571,419.99
1-31-59
1,317,699.69
538,215.36
164,321.99
2,020,237.04
1-31-60
1,638,001.67
202,449.65
149,135.09
1,989,586.41
*22 The following is a schedule of the sales and net income before Federal income taxes of the petitioner corporations and Allen's: ALLEN'S, INC.
Net Income Before
Fiscal Year
Total Sales
Income Taxes
1951
$1,002,335.13
$76,951.14
1952
1,317,734.57
84,661.66
1953
1,638,601.25
92,166.98
1954
2,032,067.39
89,871.70
1955
1,918,067.01
34,321.65
1956
2,013,695.29
25,634.84
1957
1,571,419.99
35,487.03
1958
2,020,237.04
92,180.89
1959
1,989,586.41
40,424.22
QUALITY CONCRETE, INC.
1953
$ 193,475.49
$14,762.01
1954
601,742.76
43,748.90
1955
376,680.57
19,635.77
1956
327,412.02
19,467.41
1957
197,797.95
9,569.62
1958
276,134.05
20,245.03
1959
139,535.93
1,405.46
PRE-MIXED CONCRETE, INC.
1953
$ 221,803.82
$17,663.69
1954
762,153.67
61,635.71
1955
592,849.90
25,869.16
1956
581,850.22
28,078.42
1957
502,318.47
6,547.97
1958
783,636.16
26,900.19
1959
901,585.77
53,109.11
AIRWAY CONCRETE, INC.
1954
0
$ (923.02)
1955
$ 417,204.14
27,235.22
1956
415,992.68
36,165.90
1957
319,951.87
22,660.22
1958
375,395.85
19,189.39
1959
359,481.88
34,196.55
SPEEDY-MIX CONCRETE, INC.
1954
$ 174,279.29
$11,967.48
1955
67,976.12
5,940.75
1956
101,970.09
4,002.50
1957
10,154.21
10,327.57
1958
4,679.42
511.60
1959
110,042.29
(728.36)
*23 Following is an analysis of sales by the petitioners for the taxable years 1954 and 1955: Sales to
Fiscal Year
Sales to
Quality
Name of Petitioner
Ended
Total Sales
Allen's, Inc.
Concrete, Inc.
Pre-Mixed Concrete, Inc.
2-28-55
$756,837.67
$661,259.23
$7,176.76
Quality Concrete, Inc.
2-28-55
601,464.26
600,819.36
0
Speedy-Mix Concrete, Inc.
4-30-55
172,590.23
172,590.23
0
Airway Concrete, Inc.
2-28-55
0
0
0
Pre-Mixed Concrete, Inc.
2-29-56
592,849.90
494,584.74
2,176.50
Quality Concrete, Inc.
2-29-56
376,680.57
369,874.61
0
Speedy-Mix Concrete, Inc.
4-30-56
67,976.12
67,976.12
0
Airway Concrete, Inc.
2-29-56
417,204.14
417,049.14
0
Sales to
Sales to
Sales to
Fiscal Year
Speedy-Mix
Pre-Mixed
Airway
Name of Petitioner
Ended
Concrete, Inc.
Concrete, Inc.
Concrete, Inc.
Pre-Mixed Concrete, Inc.
2-28-55
$88,401.68
0
0
Quality Concrete, Inc.
2-28-55
0
$644.90
0
Speedy-Mix Concrete, Inc.
4-30-55
0
0
0
Airway Concrete, Inc.
2-28-55
0
0
0
Pre-Mixed Concrete, Inc.
2-29-56
88,060.24
0
$8,028.42
Quality Concrete, Inc.
2-29-56
5,896.43
155.00
754.53
Speedy-Mix Concrete, Inc.
4-30-56
0
0
0
Airway Concrete, Inc.
2-29-56
0
155.00
0
*24 In the notice of deficiency to each petitioner, respondent disallowed its $25,000 surtax exemption. The reason respondent gave in each notice was essentially the same in each case, that is, The $25,000.00 exemption from surtax provided by Section 11(c) of the Internal Revenue Code of 1954 is disallowed because it has been established that you were formed or availed of for the purpose of acquiring property from another corporation which was controlled by your stockholders and such acquisition was made for the avoidance of income tax by securing the benefit of a credit which would not otherwise be allowable. The transfer of property from Allen's to Speedy-Mix, Quality and Pre-Mixed was not made with a major purpose of securing surtax exemptions. The Ritchie brothers did not acquire control of petitioners for the principal purpose of avoiding Federal income taxes by securing a deduction, credit, or other allowance which they would not otherwise have enjoyed. Opinion The sole question is whether each petitioner is entitled to the $25,000 surtax exemption provided for in section 11(c) of the 1954 Code. The answer to this question depends on whether or not *25 the petitioners come within the interdicted purposes of section 269 [4] or section 1551 [5] of the 1954 Code. We shall consider section 1551 first. As we stated in Hiawatha Home Builders, Inc., 36 T.C. 491, 498-499 (1961), and Cronstroms Manufacturing, Inc., 36 T.C. 500, 506 (1961): The interdicted purpose of securing the surtax exemption need not be the sole or principal purpose of the transfer of property. Rather, the benefit of the exemption is to be disallowed if such purpose was a major purpose. Truck Terminals, Inc., supra.Nor will a mere showing of a business need as actuating the transfer suffice to satisfy a taxpayer's burden of proof under section 1551. In a word, the taxpayer has the burden of establishing a negative proposition, i.e., that the securing of the surtax exemption or the minimum excess profits credit was not a major purpose of the transfer. *26 After petitioners' Pre-Mixed, Quality and Speedy-Mix were incorporated, Allen's sold them certain assets. Their first contention is that section 1551 is not applicable to them because a "sale" is not a "transfer" within the meaning of that section. There is no merit in petitioners' contention. This argument was considered and specifically rejected in Hiawatha Home Builders, Inc., supra. At pages 497 and 498, we stated that: Inspection of section 1551 reveals that it uses the verb "transfers" and the noun "transfer" without limitations of any kind; and we believe that this evinces a congressional intent to cover any transfer of property - including a sale of property. * * * Moreover, it is to be observed that Congress specifically excepted transfers of money from the operation of section 1551. This indicates to us that if Congress had intended to except any further transfers, it would have spelled out the exceptions. Inclusio unius est exclusio alterius. Airway contends that section 1551 is not applicable to it because no property, other than cash, was transferred to it by anyone who was in control (as defined in section 1551) of it after the transfer. We agree. *27 Since one of the necessary elements of section 1551 is missing, the section is not applicable to Airway Pre-Mixed, Quality and Speedy-Mix do not contest the fact that they were not actively engaged in business at the time Allen's transferred property to them, nor do they contest the fact that the control provision of section 1551 has been satisfied. The issue before us has resolved itself into whether petitioners have established by the clear preponderance of the evidence that a major purpose of the transfers to them was not to secure a surtax exemption. This is a question of fact to be determined upon a consideration of all the circumstances relevant to the transfer. Truck Terminals, Inc., 33 T.C. 876, 884 (1960); Sno-Frost, Inc., 31 T.C. 1053, 1062 (1959). For several years prior to 1953, Allen's had been in the business of procuring, manufacturing, selling, and delivering concrete and related products. During this period of time, there was an active union movement in the area. The most active union was the Teamsters whose jurisdiction included motor vehicle drivers. The Teamsters' activities during this period were quite vigorous and, at times, quite *28 violent. For example, in the fall of 1953, there was a taxicab strike. The violence to persons and property was of such magnitude that the strike made national headlines. The activity of the Teamsters, however, was not confined to taxicabs. It also affected the concrete business. In the spring of 1952, Keeler, a major competitor of Allen's, was struck and unionized. Subsequently, Dolese, the other major competitor of Allen's was also struck and unionized. A big share of Allen's business was selling concrete to home builders in Wichita, Kansas, who were not unionized and wanted to avoid unionization. The home builders believed it was essential to have a nonunion source of concrete. This was for two reasons. First, it was necessary to have a steady and constant supply of concrete. If the supplier were unionized, there was always the danger that this supply could be interrupted by a strike or other strife. A home builder in Wichita testified that on two occasions his supply of concrete from Keeler, then a union company, was interrupted by labor troubles. Secondly, if the home builders' only source of concrete was a unionized supplier, the chances for the home builders to become unionized *29 was enhanced. A good illustration of this was brought out in the testimony of another home builder in Wichita who testified that on two or three occasions he had ordered concrete from Allen's and they were not able to deliver it. On these occasions he ordered from Dolese or Keeler. He testified that "the first thing the union drivers do when they get out on the job they start trying to organize your nonunion help. Consequently we don't do that any more." It is apparent from this record that the prospect of unionization represented such a substantial danger to the home builders that they were willing to take action to avoid the unions. There had been discussions among the home builders to the effect that, should all three major concrete suppliers (Allen's, Keeler, and Dolese) be unionized, the home builders would erect their own concrete manufacturing facilities. Another substantial customer of Allen's was Ritchie Construction. Ritchie Construction was engaged in the business of street construction, and, like the home builders, was nonunion. Like the home builders, it was important that they have a nonunion source of concrete. After Keeler and Dolese had been unionized, it appeared *30 Allen's was next in line. If Allen's were to be unionized, there was an excellent chance that it would lose its competitive advantage with the home building trade. As stated by Dean, "We felt the very existence of the company depended upon us remaining on that status [nonunion] with our customers." In searching for a method which might avert the oncoming labor problems, the Ritchie brothers decided that if the manufacturing functions could be separated from the sales and delivery functions, and if separate entities operated the various concrete plants, there might be a better chance to keep a nonunion source of concrete for their customers. The premise upon which this was based was the fact that the Teamsters was the most active union in the area and was concerned primarily with truck drivers. Also, they reasoned that if the manufacturing functions could be separated from the sales and delivery functions, then a unionization or an attempt at unionizing the corporation operating the trucks would not affect the entities operating the plants. The employees at the plants were not truck drivers but were principally common laborers. As such, it was felt that the Teamsters' attention *31 would not be directed toward them. If the sale and delivery corporation were organized, then the plan was that petitioners could obtain their own trucks by purchase or lease, hire new employees and carry out their own sales and delivery work. Concrete trucks were, relatively speaking, readily available and an adequate supply could be obtained within a week or so. In this manner, a source of concrete would be available to the customers. This could not be done if the plants were retained by Allen's. If there were a separation, the employees of the manufacturing plants would be completely separate from the truck drivers and there would be no bar to the manufacturing corporations' commencing their own sales and delivery work. While it was still possible that petitioners could be organized and thereby cut off the source of concrete, the Ritchie brothers believed that the risks of this occurring would be much less. To facilitate the foregoing plans, Quality and Pre-Mixed were formed in 1953 and Airway and Speedy-Mix were formed in 1954. Each corporation served a particular area of Wichita. Each operated its own manufacturing plant and had its own employees. None of the petitioners performed *32 any direct sales or delivery service. The sales and deliveries were handled through Allen's on a pre-fixed price basis. Allen's, petitioners and Ritchie Construction have remained nonunion. This is so in spite of the fact that in 1957 the Teamsters did, in fact, attempt to unionize Allen's drivers. Subsequently the attempted unionization effort was abandoned by the Teamsters. We recognize that it was possible that the plant employees could have been unionized before, after or together with the truck drivers. However, the issue is not whether the plan was infallible, see Sno-Frost, Inc., supra, at p. 1063, [6] but what was the purpose or purposes for the formation of the petitioners. Was a major purpose in transfering property to petitioners to secure additional surtax exemptions? Were the petitioners acquired by the Ritchie brothers for the principal purpose of evading or avoiding Federal income taxes by securing a deduction, credit or other allowance which they would not have otherwise enjoyed? On the entire record before us, we believe the answer to these questions is in the negative. We are convinced that tax saving was neither a major nor the principal purpose for *33 which petitioners were formed, and that they would have been formed regardless of whether tax savings would have resulted. Based on the record before us, we hold that Quality, Pre-Mixed and SpeedyMix have shown by a clear preponderance of the evidence that securing a surtax exemption was not a major purpose of the transfer of property to them. Similarly, we hold that the Ritchie brothers did not acquire control of petitioners for the principal purpose of securing a deduction, credit or other allowance to which they would not otherwise have been entitled. To take into account certain conceded adjustments Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Quality Concrete, Inc., Docket No. 83537; Airway Concrete, Inc., Docket No. 83538; and Speedy-Mix Concrete, Inc., Docket No. 83539.↩
2. A batching plant consists of a large bin and scales where the aggregates of cement, rock and sand can be properly apportioned according to specifications and placed in a truck for delivery. It is to be contrasted with a pre-mix plant which does a partial mixing job on the aggregates before they go into a truck. To receive concrete from a batching plant, the customer needs a truck which mixes the aggregates with water after it is placed in the truck. At a pre-mix plant, the concrete can be hauled away in a dump truck, pick-up truck or similar vehicle because no additional mixing is necessary.↩
3. Airway Concrete, Inc.; Pre-Mixed Concrete, Inc.; Quality Concrete, Inc.; Ritchie Bros. Construction Company; Asphalt Paving, Inc.; Speedy-Mix Concrete, Inc.; R. & A. Maintenance Corp.; Superior Sand Company, Inc.; Commercial Asphalt, Inc.↩
4. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. ↩
5. SEC. 1551. DISALLOWANCE OF SURTAX EXEMPTION AND ACCUMULATED EARNINGS CREDIT. If any corporation transfers, on or after January 1, 1951, all or part of its property (other than money) to another corporation which was created for the purpose of acquiring such property or which was not actively engaged in business at the time of such acquisition, and if after such transfer the transferor corporation or its stockholders, or both, are in control of such transferee corporation during any part of the taxable year of such transferee corporation, then such transferee corporation shall not for such taxable year (except as may be otherwise determined under section 269(b)) be allowed either the $25,000 exemption from surtax provided in section 11(c)↩ or the $60,000 accumulated earnings credit provided in paragraph (2) or (3) of section 535(c), unless such transferee corporation shall establish by the clear preponderance of the evidence that the securing of such exemption or credit was not a major purpose of such transfer. For purposes of this section, control means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of the corporation. In determining the ownership of stock for the purpose of this section, the ownership of stock shall be determined in accordance with the provisions of section 544, except that constructive ownership under section 544(a)(2) shall be determined only with respect to the individual's spouse and minor children. The provisions of section 269(b), and the authority of the Secretary under such section, shall, to the extent not inconsistent with the provisions of this section, be applicable to this section.
6. As we stated in Sno-Frost, Inc., supra: It well may be and in fact it is demonstrated that some of the stated reasons of Superior in incorporating petitioner were not well founded, but this does not nullify the existence of the reasons. * * *↩