The **LOUISVILLE STORE OF LIB-ERTY, KY., INC.**

v.

The **UNITED STATES, and eight** related cases.

Nos. 270–63, 218–65, 219–65, 220–65 to 225–65.

United States Court of Claims.

April 14, 1967.

———◆———

James E. Fahey, Louisville, Ky., for plaintiff.

Edna G. Parker, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner William E. Day with directions to make findings of fact and recommendations for conclusion of law. The commissioner has done so in a report and opinion filed on December 15, 1966. Defendant has filed no exceptions to or brief on this report and the time for so filing pursuant to the Rules of the court has expired. On January 27, 1967, plaintiff filed a motion that the court adopt the commissioner's findings of fact, opinion and recommended conclusion of law to which defendant has not responded within the time as set forth in the rules and the case has been submitted to the court without oral argument. Since the court agrees with the commissioner's findings, opinion and recommended conclusion of law, as hereinafter set forth, and on the basis of the decision of the court in Alinco Life Insurance Co. v. United States, Ct.Cl., 373 F.2d 336, decided February 17, 1967, it hereby adopts the same as the basis for its judgment in this case. Plaintiffs are therefore entitled to recover and judgments are entered for plaintiffs with the amounts of recovery to be determined pursuant to Rule 47(c).

OPINION OF COMMISSIONER *

DAY, Commissioner:

These nine cases, which were consolidated for trial, are suits for refund of income taxes paid pursuant to assessments for income tax deficiencies made by the Commissioner, and involve the years 1960, 1961 and 1962. The Commissioner of Internal Revenue has determined that the deficiencies should be assessed because, in his view, the principal

---

* The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57 (a).

purpose of creating the nine corporations was to evade income tax by obtaining a separate surtax exemption for each corporation. The plaintiffs paid the additional taxes assessed, plus interest, and sue for their recovery after claim for refund was timely filed and disallowed.

In their income tax returns for the years in suit, the plaintiffs claimed entitlement to one $25,000 surtax exemption for each plaintiff. The Commissioner's determination allowed one $25,000 surtax exemption for all nine plaintiffs, as if only one corporation had been created.

The plaintiffs contend that there were good and sufficient business reasons for the creation of nine separate corporations and that the principal purpose of incorporation was not "evasion or avoidance of Federal income tax" within the meaning of section 269.

The facts are set forth in the detailed findings and will be summarized.

Around the turn of the century, Max Shapira founded a retail clothing and drygoods store at New Haven, Kentucky. In 1915, the store was moved to Springfield, Kentucky. Max Shapira was joined by his son, Gary, and the store was operated as a partnership under the name "M. Shapira & Son." In 1921, Max Shapira died and his wife, Annie, succeeded to his interest in the partnership. Gary had four brothers—George, Ed, David and Mose—in that order. As each younger brother attained majority, he was admitted to the partnership as an equal partner. In 1951, Annie Shapira died and her five sons acquired her interest in the business in equal proportions. The business was thereafter operated under written articles of partnership.

Beginning in 1928, additional stores were opened from time to time in small Kentucky county seats. By February 1959, 13 stores were operated: two each in Bardstown and Elizabethtown and one in each of nine other towns. These stores were the usual small town family clothing stores. They sold medium- and low-priced ready-to-wear clothing (including shoes) for men, women and children, yard goods, other staple household drygoods, such as sheets, towels, rugs, blankets, curtains, draperies, and a few items of luggage, toys and furniture.

Each store building was leased. The lessor in all but one instance, was unrelated to the Shapira family.

Prior to 1935, a central warehouse serving all stores was maintained at Springfield, Kentucky, where the main offices of the partnership were located. In that year, both the warehouse and the main offices of the partnership were moved to Louisville, into a combined warehouse and office building acquired by the partnership.

Gary Shapira, the eldest brother, was the chief executive of the business, and was responsible for making most of the policy decisions. That is not to say that this was accomplished without discussions among the partners, because such discussions were had at least weekly among all of the partners. The younger brothers, however, looked to Gary for leadership, which he provided.

Until 1959, Gary Shapira closely supervised all store managers, hired and fired all employees, and regularly visited all stores. The brothers, George, David and Mose, shared responsibilities in the buying of merchandise, dividing among them the class of merchandise each purchased. Ed Shapira, while participating in the weekly partnership meetings, usually on weekends, devoted most of his time to the operation and management of the Shapira family-owned, or closely held, whiskey distillery at Bardstown, Kentucky.

In 1949, Curtis Pittman was employed by the partnership as comptroller. Not related to the Shapira family by blood or marriage, he came to the firm from the accounting firm which had done the accounting work for the partnership for some time. From the beginning of his employment by the partnership, in addition to the accounting functions which he performed, he was an assistant to Gary Shapira and usually accompanied Gary on

his regular visits to the various stores. One or two days per week were devoted to such visits. Pittman was consulted on management and policy decisions and was kept informed of any projected plans for the operation of the business enterprise carried on by the partnership.

On weekends, the five partners regularly assembled to talk over the business operations of the partnership and also any projected plans for the future. Pittman usually attended these meetings. No minutes were kept of such meetings. Over the years 1957 and 1958, at such meetings, Gary had advanced the idea of the incorporation of each retail store operation. Discussions continued concerning this subject and in the six-month period prior to incorporation it was discussed at practically every meeting of the partners.

Gary was concerned about his own estate planning problems. In 1957, he and his wife were 56 years of age and had two children. George Shapira was 54 years old and unmarried. Ed Shapira and his wife were 50 and had two children. David Shapira and his wife were 43 and had two children. Mose Shapira and his wife were 42 years old and had one child.

In December 1958, the partners, influenced in their consideration by Gary, concluded that a rearrangement of their business should be accomplished, from operating the retail stores under the partnership to the incorporation of each store which was showing a profit, in order to achieve continuity of the business operation upon the demise of any partner.

The total sales of the partnership for each of the taxable years 1956, 1957 and 1958 exceeded two and one-half million dollars. No single store, during these years, had sales in excess of one-half million dollars.

The partners were also concerned over the increasing possibility of the enactment of legislation covering the employees of small retail stores under the minimum wage laws, which employees were not then affected by such legislation. It was felt that this was a real threat to the profitability of the store operations which could be countered by the separate incorporation of each individual store.

The partners also believed that it would separate incorporation of the stores would enable the business to better avoid the possibility of the unionization of their employees.

The partners also believed that it would further the business of the store operation if they might achieve more of a local image for each individual store, identifying it to a greater degree with the place of its operation. In addition, they felt that they could increase store managers' incentive toward greater profitability of the individual stores with a profit-sharing plan, by offering store managers an opportunity to purchase shares of stock of the individual store operation. The partners believed that all of the objectives mentioned above could best be accomplished by separate incorporation of the individual stores.

After the incorporation of the stores, three of the managers were given an opportunity to and did purchase two shares out of a total (for the three stores respectively) of 250, 195 and 115 shares. The expansion of the stock purchase plan for the managers was halted after incorporation because of the statements made to Pittman by Internal Revenue agents during 1960 and 1962 examinations of the store books.

After deciding in 1958 on the separate incorporation of the individual stores, the partners and Pittman in December of that year, called in their attorney and accountants to discuss the matter. The pros and cons of the move to incorporate were discussed in a 2½- to 3-hour meeting at which Gary led the discussion for the partners. The availability of a surtax exemption for each store was discussed. The partners, at this meeting, decided to go forward with the incorporation of the plaintiff companies.

Upon the formation of the store corporations, Gary was elected president of

each. He and each brother were elected as officers of each corporation.

On February 1, 1959, the partnership transferred to the plaintiff corporations the assets and liabilities (except merchandise inventories) employed by the store at which each corporation was to do business, in exchange for capital stock equal to the book value of exchanged assets (which included furniture and fixtures, leasehold improvements, prepaid expenses, accounts receivable, cash on hand and the lease on such store). The partnership received the following amounts of capital stock in the plaintiff corporations at $100 per share par value.

The Louisville Store, Liberty, Ky ........................$ 6,886.30
The Hub Store, Elizabethtown, Ky ...................... 11,114.98
The Lincoln Shop, Bardstown, Ky ...................... 5,997.53
The Louisville Store, Bardstown, Ky .................... 12,436.13
The Louisville Store, Danville, Ky ...................... 24,723.04
The Louisville Store, Harrodsburg, Ky ................. 7,015.64
The Louisville Store, Lawrenceburg, Ky ................. 12,356.59
The Louisville Store, Springfield, Ky .................... 7,472.40
The Peoples Store, Elizabethtown, Ky .................... 19,290.04
The Lincoln Store, Harrodsburg, Ky .................... 2,512.93
The Louisville Store, Princeton, Ky .................... 20,684.44

On February 1, 1959, each store corporation purchased for cash from the partnership the inventory on hand in the store which the corporation was to operate. The cash amounts paid for such inventory were as follows:

The Louisville Store, Liberty, Ky ........................$28,836.57
The Hub Store, Elizabethtown, Ky ...................... 38,011.24
The Lincoln Shop, Bardstown, Ky ...................... 17,512.82
The Louisville Store, Bardstown, Ky .................... 40,610.19
The Louisville Store, Danville, Ky ...................... 54,923.46
The Louisville Store, Harrodsburg, Ky ................. 31,519.20
The Louisville Store, Lawrenceburg, Ky ................. 39,970.38
The Louisville Store, Springfield, Ky .................... 26,484.76
The Peoples Store, Elizabethtown, Ky .................... 48,731.38
The Lincoln Store, Harrodsburg, Ky .................... 15,691.32
The Louisville Store, Princeton, Ky .................... 28,502.27

Each corporation borrowed the entire amount necessary to purchase its opening inventory, form a bank in Louisville, for which the bank took only unsecured notes from each borrower. The payment of the notes was not guaranteed by the partnership, any of its partners, nor anyone else. By January 31, 1963, the loans made to seven plaintiffs had been paid in full. Two plaintiffs still owed $15,000 each. They were: The Louisville Store, Harrodsburg, Kentucky and The Peoples Store, Elizabethtown, Kentucky.

The partnership continued in business as a partnership with the five brothers as partners. It furnished buying, warehousing and administrative services pursuant to written agreements, to each plaintiff corporation. For these services a monthly service fee was paid by each plaintiff, prorated on gross sales of each plaintiff to the gross sales of all stores including those two (Owensboro and Winchester) still owned by the partnership.

Although the officers of the plaintiff companies (except Ed Shapira) continued after incorporation, there was much less supervision of the individual stores by the Shapiras and much more control of the operation of the individual stores by the store managers. They had a greater hand in determining the price at which goods should be sold. They decided upon the hours of opening and closing of the store. They were responsible for hiring and firing of store employees. In addition, they had most of the contacts with the advertising media for which they prepared most of the copy.

In November 1960, the partnership purchased from each plaintiff corporation, for cash at current book value, sufficient additional shares to enable an equal distribution of shares among the five Shapira brothers. This distribution took place immediately thereafter.

On December 19, 1960, Gary Shapira died testate. Under the articles of partnership, his surviving brothers purchased Gary's partnership interests and continued the partnership business. Gary's stock in the plaintiff corporations was disposed of in accordance with his will, to a bank as executor and trustee for the benefit of his wife and daughters.

Each of the plaintiff corporations kept its books on the accrual method of accounting, filed timely federal tax returns for the years involved (fiscal years 1960, 1961 and 1962) and paid the tax shown thereon to be due. Finding that the incorporation of the individual retail stores was an acquisition made to evade or avoid income tax within the meaning of section 269 (of the 1954 Code) and allowing but one surtax exemption as to the entire group of plaintiff corporations, the Commissioner of Internal Revenue assessed deficiencies against each plaintiff. The additional amounts assessed were paid (as shown in finding 4), claims for refund were timely filed and disallowed.

In imposing the surtax on the taxable income of a corporation, section 11(c) of the Code provides an exemption of $25,000. In section 269(a), it is provided that if a person (or persons) acquires control of a corporation and the principal purpose of such acquisition is evasion or avoidance of federal income tax by securing the benefit of a deduction credit, or other allowance which such person or corporation would not otherwise enjoy, then the deduction credit, or allowance, shall not be allowed. For the purposes of section 269(a) (1), control is defined as ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote. Dillier, 41 T.C. 762, 784 (1964). Acquisition of control as used in section 269, includes the formation of new corporations. James Realty Co. v. United States, 280 F.2d 394 (1960), Kessmar Construction Co., 39 T.C. 778 (1963), Dillier, supra.

It is the burden of the plaintiffs to establish by a preponderance of the evidence that among the reasons underlying the incorporation of the individual retail store corporations the principal purpose was not to obtain the benefit of the surtax exemptions. The plaintiff has met this burden by showing that there were many other sound business reasons for the incorporation of the individual stores and that the securing of surtax exemptions for each plaintiff was not *the principal* purpose of such incorporation. All of the evidence produced at trial was produced by the plaintiff except for three sample bank checks on which the remittance advice contained the legend: "address all correspondence regarding this payment to M. Shapira & Sons, Heaven Hill Building, 528 West Main Street, Louisville, Kentucky." The sample checks were "National Cash Register bookkeeping type checks" on which the name of the drawer and the name of the bank were placed on the check by the NCR bookkeeping machine. Since the partnership continued to perform the accounting services of each plaintiff after incorporation, the legend quoted above, it would seem, loses any significance. The defendant, accordingly, relies on the weakness or failure of the plaintiffs to prove the allegations of their petitions.

I am convinced that the facts show many valid business reasons which were served by the incorporators of the plaintiffs and demonstrate rather clearly that the principal purpose of organizing the separate corporations was not to evade or avoid taxes. That is not to say, however, that the incorporators were not aware of the benefits of the surtax exemptions, because after they had concluded for such business reasons to incorporate, they consulted with their attorneys and accountants who discussed these benefits with them.

Congress, in considering the Revenue Act of 1964, reviewed the application of the provisions of section 269, concluding that there were indeed legitimate business reasons in the use of multiple corporations where corporations owned or controlled by the same interests, as here, conduct the same type business in different geographical locales, as here. The Senate Finance Committee made the following comment in this connection:

\*   \*   \*   \*   \*   \*

While the House and your committee recognize the advantages of use of multiple corporations, it is believed, as it has been in the past, that, where corporations owned and controlled by the same interests engage in different businesses in the same area or conduct the same type business in different geographical locales, there are legitimate business reasons for use of separate corporations and, therefore, the separate corporations should generally be recognized as separate taxpayers, retaining the benefit of use of multiple surtax exemptions. However, the House and your committee do not intend to encourage the formation of these multiple corporations and therefore propose to apply higher tax rates to corporations which are members of an affiliated group of corporations. Of course, nothing in this bill is intended as changing the application of sections 269, 1551, or 482 if the multiple corporation form of organization is adopted to avoid taxes.

\*   \*   \*   \*   \*   \*

Sen.Rep. 830, 88th Cong. 2d Sess., pp. 149–150, Cum.Bull. 1964–1 (Part 2) pp. 653–654.

The House Ways and Means Committee adopted similar language in its report on the same subject. See H.R.Rep. No. 749, 88th Cong. 1st Sess., Cum.Bull. 1964–1 (Part 2) p. 242.

The facts in this case as found and as detailed above find even stronger support for the plaintiffs' position here than the facts in the case of V. H. Monette & Co., 45 T.C. 15 (1965), where the plaintiff prevailed on the issue here involved. In that case, after incorporation of the multiple corporations (there were six), business was still conducted under the old name, books and records were maintained at the home office, no bank accounts were ever maintained in the names of the individual companies and bills were sent to the home office for payment. The Tax Court, nevertheless, found that the multiple companies were formed not as shams or tax avoidance devices, citing Bush Hog Mfg. Co., 42 T.C. 713 (1964).

Estate planning considerations were found to be valid business purposes supporting the allowance to newly formed corporations of the right to the benefit of the separate $25,000 surtax exemptions in Cronstroms Mfg. Co., 36 T.C. 500 (1961). So also in this case, the estate planning considerations were a valid business purpose of the plaintiffs' incorporators.

The evidence shows that the incorporators were genuinely concerned about the possibility of the coverage of their employees under the Federal Minimum Wage legislation. They believed that the multiple incorporation of its retail stores would help them to avoid the adverse effects of such proposed legislation. This is a valid purpose in the formation of such separate corporations. See Fedcal Dist. Co., 22 T.C.M. 935 (1963). Likewise, they believed that they could better avoid the possibility of the unionization of their employees if separate corporations were formed. The Tax Court in a case involving a similar situation found

**320**

such a reason for separate incorporation to be a valid business purpose quite apart from the tax avoidance or evasion purposes referred to in section 269 of the Code. Pre-Mixed Concrete, Inc., 21 T.C.M. 1601 (1962).

The defendant argues in effect that the incorporators of the plaintiff companies could have accomplished all proper business objectives by the formation of but one corporation and point to the successful J. C. Penney firm as an example of one corporation operating many retail branches. The fact that Penney can operate a successful retail business under one corporate entity does not negate the valid business purposes which might prompt the formation of multiple corporations.

Since Gary Shapira was deceased at the time of trial, the defendant in its brief takes the position that it was the burden of the plaintiffs in attempting to show motives of the partners that it be done only by the remaining partners. As is shown in the findings, Gary was the eldest of the partner-brothers, his judgment was respected and followed by the other partner-brothers, as one of them, George Shapira, testified. Most of the testimony bearing upon the motives of Gary in persuading the other partners upon the course of action resulting in the incorporation of the retail stores came from Curtis Pittman, a trusted employee who spent the greater part of each working day with Gary. His testimony was competent, it was believed, and was probably the best evidence of such purposes available to the plaintiff. Mutual Life Insurance Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892).

It is determined that the valid business purposes for incorporating the plaintiff companies detailed in the findings far outweigh any tax consideration which the incorporators might have had. The purpose of incorporation of the plaintiff companies was, therefore, not principally to avoid or evade income tax within the meaning of section 269. Accordingly, each plaintiff is entitled to the benefit of the $25,000 surtax exemption.