Fedcal Distributing Company, et al. [1] v. Commissioner. Fedcal Distributing Co. v. Commissioner
Docket Nos. 92974-92977.
United States Tax Court
T.C. Memo 1963-193; 1963 Tax Ct. Memo LEXIS 151; 22 T.C.M. (CCH) 935; T.C.M. (RIA) 63193; July 22, 1963
Frederick B. Warder, Jr., for the petitioners. Robert L. Gnaizda, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: In these consolidated proceedings respondent determined deficiencies in petitioners' income tax for the taxable years and in the amounts set forth below: Docket
Fiscal year ended
Petitioner
No.
March 31
Deficiency
Fedcal Distributing Co.
92974
1957
$4,125.00
1958
4,125.00
1959
4,125.00
Winfed Distributing Co.
92975
1957
3,811.47
1958
4,125.00
1959
4,125.00
Oxford Distributing Co.
92976
1957
4,125.00
1958
4,125.00
1959
4,125.00
Old Fed Distributing Co.
92977
1957
3,811.90
1958
4,125.00
1959
4,125.00
*152 The sole issue for decision is whether the principal purpose for the acquisition of the four petitioner corporations was evasion or avoidance of Federal income tax within the purview of section 269, Internal Revenue Code of 1954. Findings of Fact Some of the facts were stipulated by the parties. Their stipulation, together with attached exhibits, is incorporated herein by reference. Petitioners are California corporations having as their principal business the retail sale of liquor and other alcoholic beverages. Their returns for the fiscal years ended March 31, 1957, 1958, and 1959, were filed with the district director of internal revenue, Los Angeles, California. Ray Murphy is an individual who has long been associated with the liquor industry, both in its wholesale and retail aspects. After having lost a successful Wall Street securities business as a result of the depression, he became associated in 1933 with a wholesale liquor firm in New York City. When this business was sold in 1937 as a result of union difficulties he became sales manager of a national liquor importing concern. Sometime in 1940 Murphy moved to California. From that date until *153 1944 he was a partner in a west coast wholesale liquor operation. Then, following a short venture into the manufacture of aircraft parts, Murphy, in 1946, reentered the liquor field, this time as a partner in a wholesale liquor distributorship at Reno, Nevada. When, in 1952, the Reno distributorship as a result of the Korean war lost its principal suppliers and was sold, Murphy returned to Los Angeles, California, for the purpose of investigating business opportunities there. In April of 1954, Murphy became acquainted with the officials of Federal Employees Distributing Company (hereinafter referred to as Fedco), a nonprofit corporation, the purposes of which is to make available to its members, [2] who own the organization, merchandise at a discount price. Fedco had been formed in 1949, and as of April 1954 had two department stores located at Los Angeles and Lakewood, California, both within what comprises the Greater Los Angeles area of southern California. By letter, dated May 26, 1954, Fedco offered to Ray Murphy, as an individual, the exclusive franchise, or concession, to merchandise liquor in the two existing Fedco stores, in a third Fedco store under construction at San Bernardino, *154 California, and due to commence operation in the summer of 1954, and in any additional stores which Fedco might open where liquor could be sold. This offer, which when endorsed by Murphy and Fedco's president on May 27, became a binding contract provided, in part, as follows: It is understood that we are entering into this agreement with you as an individual and that this contractual arrangement will not be assignable or subject to sale or alienation in any manner whatsoever, either in whole or in part, except with the written approval of Fedco. Likewise, in the event of your bankruptcy or insolvency or in the event that you make an assignment for the benefit of creditors, or in the event that you fail to release an attachment on liquor stock in any Fedco store within seventy-two hours after said attachment is imposed, this contract shall, upon thirty days notice in writing, be cancellable at the option of Fedco. In the event that your liquor license is terminated in any store for a period of thirty days or longer, this agreement with respect to that particular Fedco outlet shall be cancellable at the option of Fedco. *155 You agree to make a contractual arrangement with one of the leading distillers for an 86 proof and a bond the equivalent of one of their leading brands, and these are to be subject to our ratification and approval. Furthermore, these liquors are to be bottled under a label which Fedco shall decide upon at a later time. You also agree to arrange with a leading distiller for a quality blended whisky which will sell somewhat under the 86 proof. In addition, you shall store a private label imported Scotch whisky, gin and vodka. * * *
You will agree to commence operations in the Slauson Avenue and Bellflower stores in not less than ninety days after the execution of this contract, and will further agree to commence operations in the San Bernardino store at the time of its opening in the late summer or early fall of 1954. This concession shall operate in each of the above mentioned stores, or any additional outlets, for a term of five years commencing on the day you start operations in the first store and terminating five years hence; provided, however, that Fedco shall have the sole, unrestricted and exclusive option to terminate this contract and the liquor concessions in all *156 three Fedco stores, or any additional outlets, at the end of two years from the time you commence operations in the first of the Fedco stores, and provided that Fedco gives you at least thirty days notice in writing of its intention so to terminate. * * * We understand that in order to enter into this agreement you propose to buy three "off sale" liquor licenses, that is to say, one for each of the three Fedco stores, plus such licenses as may be required for any additional outlets. In the event that Fedco terminates this agreement after two years, as hereinabove provided, and in the further event of any legislative or other governmental action or regulation which has the effect of prohibiting the sale or transfer of any such "off sale" liquor licenses, as a result of which you incur a loss with respect to said licenses, or any of them, Fedco agrees to reimburse you for one half of any such loss but in no event to exceed the payment of $8500.00. In the event such reimbursement is made, you agree to assign to Fedco, at Fedco's option, 50% of all your right, title and interest in and to said liquor licenses. You are to conduct no advertising at the premises without first obtaining *157 Fedco's written approval therefor. All costs of setting up the concessions are, of course, to be borne exclusively by you, and you by this agreement are to hold Fedco harmless for any liability whatsoever arising out of your operations. You are to carry adequate insurance for all purposes, including products liability insurance, protecting yourself and Fedco, except that Fedco agrees to maintain adequate liability insurance with respect to the physical premises of all stores. For approximately the next two years Ray Murphy, using the name Fedcal Distributing Company, conducted as sole proprietor under the above agreement a retail liquor business in each of three Fedco stores located respectively at Los Angeles, Lakewood, and San Bernardino, California. Murphy also operated a liquor concession at a fourth Fedco store in Van Nuys, California, during a part of this time. While each of these stores is located no more than an hour's drive from some central point in downtown Los Angeles, the San Bernardino store is approximately 75 miles from the Lakewood store, 70 miles from the Los Angeles store and 80 miles from the Van Nuys store. The Lakewood store is approximately 20 miles from the *158 Los Angeles store and 45 miles from the Van Nuys store. The Los Angeles store is approximately 25 miles from the Van Nuys store. Although the class of customers (Federal, State and local Government employees) serviced by all Fedco stores is the same, each is in a trading or marketing area separate from the others and each has individual customers distinct from those patronizing the other stores. The operation which Murphy was conducting at the four Fedco stores was, at the time, unique. Under his agreement with Fedco Murphy had contracted to sell only "private label" liquors. The standard brand sold at each store, whether it be bourbon, scotch, vodka, gin or blended whisky was "Old Fedcal." By 1955 Murphy's business had become quite successful. The three liquor businesses conducted under the individual proprietorship, Fedcal Distributing Company, had a net income (before Federal taxes) in that year of $67,164.60. Yet, while the operation as a whole had been profitable, by the beginning of 1956 Murphy was becoming concerned about the method in which he had chosen to do business. Although the sole proprietorship had sufficed to begin the operation, Murphy now believed it denied him *159 business flexibility. Under the highly restrictive liquor concession agreement which he had with Fedco, he was required to own 100 percent of the proprietorship operating the liquor concessions at Fedco stores. Even in the absence of such an agreement, Murphy felt that should he so desire, he could not, without sharing the management, sell either a part of an individual store or a part of the entire operation. Under the proprietorship system the success of the entire operation could be jeopardized by one unprofitable store. Nor, as a sole proprietor, could he diversify into other business ventures without risking his entire net worth. In short, personal ownership of the liquor stores did not provide the severability of which Murphy was now desirous. Additionally, by the early part of 1956 Murphy had become quite concerned about his licensing arrangements with the Alcohol Beverage Control Board of the State of California. Each o the liquor stores had a separate retail liquor license, and, under the proprietorship they were all registered with the Board in Murphy's individual name. Murphy thus feared that a liquor violation at one store would bring difficulty in all stores because *160 he was the common holder of all licenses. Further, the liquor business, being like many others, is divided up into the so-called "chain" operations and the small, one-store operations. Relations between these groups is often less than cordial. Murphy, as a multiple licensee, was a chain operator. During years prior to 1956 there was a considerable amount of political agitation in California by associations of small liquor dealers for state-wide legislation restricting to one the number of licenses which any single individual or firm could hold. Murphy feared the passage of such legislation, as well as action by the A.B.C. Board itself to prevent or restrict the transfer of individual licenses. Such restrictions would have the effect of making a liquor business unsalable or of small value, a liquor license being the sine qua non to the operation of a liquor business. Murphy was familiar with the existing difficulties inherent in the transfer of liquor licenses. In 1954 he had encountered substantial difficulty in obtaining Board approval of a transfer to him of one of the Fedco licenses. His efforts in April of 1955 to have a liquor license transferred to another discount operation *161 in northern California were almost blocked by protests to the Board filed by the Retail Liquor Dealers Association of Northern California. Only after long and costly delay was this transfer, in November of 1955, approved. With a view to obtaining greater flexibility of operation for both diversification with minimum financial risk and more liquidity in his liquor concession investment, securing to the greater extent possible his liquor licenses, and obtaining a more equitable concession arrangement with Fedco, Murphy, in 1956, engaged the services of Charles T. Munger, a Los Angeles attorney specializing in a general business and commercial practice. Murphy advised Munger that under his present proprietorship arrangement he felt he had no permanent asset value of consequence which would either survive him or be salable in the event he desired to diversify or liquidate; that based on his past experience of having a sizable income but little net worth he now "wanted to arrange [his] affairs so that he owned something which he could look at and realize had value * * *, value by the hard test that he could, if he wished, at any time sell it to somebody else." Murphy also advised Munger *162 of his desire to protect himself to the greatest extent possible against either legislation or orders of the A.B.C. Board limiting the transferral of liquor licenses, since such action would operate to decrease the value of his operation as a going business. The subject of Murphy's concession agreement with Fedco was also discussed extensively by the two men. Munger considered Murphy's problems to be substantially interrelated. Severability of the operation for purposes of diversification or sale was blocked by both the restrictive Fedco concession arrangement requiring Murphy to own 100 percent of the operation and by the regulations of the A.B.C. Board restricting the transferral of liquor licenses. Under California A.B.C. law as it existed in 1956, while the transfer of either an interest in a license or the license itself required the consent of the Board, no such limitation obtained with respect to transfers of stock in a corporation holding an A.B.C. license. Munger was further of the opinion that Murphy might to a certain degree protect himself from A.B.C. Board pressure by having each of the liquor licenses, then held by him individually, "in the name of a separate company, *163 so that if he had a violation * * * in San Bernardino, it would come into the A.B.C. records as a violation of the XYZ corporation out there instead of coming in his own name, * * * [and] if there were a second one it would be harder to key them together in the records of the A.B.C." Based on an analysis of his problems, Munger advised Murphy to renegotiate his concession agreement with Fedco whereby he would be permitted to organize a separate corporation to take over the business of each one of the four stores then being operated under sole proprietorship, and allowed to sell as great an interest as possible in such corporations without first having to obtain Fedco's consent. Acting upon Munger's advice, Ray Murphy, on February 29, 1956, caused the three petitioners Federal Distributing Company, Oxford Distributing Company and Winfed Distributing Company (hereinafter referred to respectively as Fedcal, Oxford and Winfed) to be organized and incorporated under the laws of the State of California. On March 16, 1956, following negotiation by Murphy and Munger, Fedco granted Murphy the following changes in their earlier concession agreement of May 26, 1954: (1) We hereby grant *164 you the right to assign the agreement, either entirely or with respect to a particular outlet or outlets, to any corporation or corporations of which you have voting control, or to any limited partnership of which you are sole general partner, the rights of any such corporation or limited partnership to continue in effect only so long as you or the legal representative of your estate continues in voting control or as sole general partner. Except as herein provided, the agreement will not be assignable without written agreement of Fedco, and you agree to make available to Fedco at all times names of any other shareholders or limited partners. (2) The term of the agreement shall last indefinitely, subject only to a right in either party to terminate the same, either entirely or with respect to a particular outlet or outlets, by the giving to the other party of advance written noticc of termination, such termination to be effective on the fifth June 30th following delivery of the notice of termination. It is recognized that under this arrangement each of us, at all times prior to delivery of a notice of determination, will be bound for a minimum period of four years. The purpose of *165 this arrangement is to enable you to contract for case whiskey and/or purchase bulk whiskey four years in advance of anticipated need. Thereafter, on March 23, 1956, the fourth petitioner, Old Fed Distributing Company (hereinafter referred to as Old Fed), began its corporate existence. The officers of all of the petitioner corporations were identical, being Ray Murphy, Francis M. Bishop and Frank E. Helin. As stated in their Articles of Incorporation, the primary purpose for which each was formed was "the distribution of distilled spirits, both wholesale and retail, in and around Los Angeles County, California." A statement of general purposes contained in the Articles of Incorporation of each petitioner is as follows: (a) To sell and distribute distilled spirits; (b) To purchase, acquire, own, hold, lease either as lessor or as lessee, to pledge, mortgage, deed in trust or otherwise encumber, to sell, exchange or otherwise dispose of, to invest in to improve, repair, alter, operate and deal in and with real and personal property of every sort, nature, and description, and any and all interests therein; (c) To engage in and to carry on any and all kinds of manufacturing businesses; *166 (d) To acquire by purchase, lease, or otherwise, the business, good will, rights, assets and property of any person, firm, association or corporation either with or without assuming the while or any portion of the liabilities of said person, firm, association or corporation, and to pay for the same in cash, in the stock or bonds of this corporation, or otherwise; to hold or to sell or otherwise dispose of all or any portion of the property so acquired; to operate or conduct in any lawful manner the whole or any portion of any business so acquired, and to have and to exercise such powers as may be necessary or convenient, in, to or connected with the management and operation of said business; (e) To borrow money and issue bonds, debentures, notes and evidences of indebtedness, and to secure the payment of performance of its obligations by pledge, mortgage, deed of trust or otherwise; (f) To acquire, subscribe for, hold, own, pledge, and otherwise dispose of and represent shares of stock, bonds, and securities of any other corporation, domestic or otherwise; (g) To purchase or otherwise acquire its own bonds, debentures, or other evidences of its indebtedness or obligations, *167 and, subject to the provisions of Division 1 of the Corporation Code, to purchase or otherwise acquire its own shares; (h) To engage in any business whatsoever which this corporation may deem convenient or proper in furtherance of any of the objects hereinabove mentioned or otherwise, to the same extent and to the same effect as in the case of an individual; to qualify and to do business in any other state, territory, dependency, or foreign country, and to conduct business within or without the State of California; to have and to exercise all powers authorized by the laws of the State of California under which this corporation is formed, whether expressly set forth in this Third paragraph or not. The sub-paragraphs (a) to (h), inclusive, of this Third paragraph, as hereinabove set forth, shall be construed both as statements of purchases and powers, and the statements contained in each clause of said sub-paragraphs shall not be limited or restricted by references to or inference from the provisions of any other clause. Effective April 2, 1956, and pursuant to the revised Fedco concession agreement of March 16, 1956, all of the assets and liabilities of each of the four retail *168 liquor concessions operated by Ray Murphy individually were transferred to and divided among the four newly formed petitioner corporations. Fedcal henceforward operated the liquor business located in the Fedco store at Los Angeles. Winfed took over the San Bernardino operation while Oxford and Old Fed acquired the concessions located respectively at the Fedco stores in Lakewood and Van Nuys. Although since March 23, 1956, each petitioner has had the same corporate officers, during the years here in question each has maintained its own set of books, records, bank accounts, cash system, invoicing system, purchasing system, and expense system, all separate and distinct from one another. Each makes its own purchases of liquor and other supplies and pays its costs and expenses with its own funds. Each has its own separate inventory. All merchandise is delivered separately to each liquor store and each of petitioners is invoiced separately by its suppliers. Each petitioner is licensed by the State of California to sell liquor only at its own location. Each makes its sales only at its separate store. Each has its own excise license and pays its own excise taxes. Each petitioner maintains *169 its own employees and pays them with its own funds. Each keeps its own separate payroll records and complies with all individual payroll procedures required by State and Federal law, including those regarding workmen's compensation, income tax withholdings, and social security contributions, all separate and apart from those of the other petitioners. Each petitioner employs a general manager and several clerks at its own store, distinct from those employed by the other petitioners, and there is no interchange of these employees among petitioners. While each petitioner employs the same bookkeeper and two clerical assistants at a central administrative office, the overhead expenses of such office are apportioned pro rata among them. No sales are made at the central office. None of petitioners ever lends money to any of the others. There is no commingling of funds among them, nor does any petitioner ever guarantee the liabilities or extend credit to any of the others. Since April 2, 1956, and during the years here at issue, petitioners have operated in each of four Fedco stores a "private label" discount liquor operation. Because of this unique type of operation, they are able, separately, *170 to obtain volume discounts on wholesale liquor purchases direct from distillers. By and large there is no warehousing (apart from a limited inventory which each petitioner maintains on its premises within a Fedco store) of liquor in petitioner's operations. Much of the whisky used by petitioners is shipped in bulk from the distillers and bottled in Los Angeles. It is stored by the bottled in Los Angeles. It is stored by the bottler (whose charge includes storage) until ordered by one of petitioners, and is then shipped out to that petitioner. Continuing negotiations between Murphy, Munger and Fedco resulted, in December of 1958, in a new concession agreement between Fedco, the four petitioners and Murphy. The principal purpose of this agreement was both to formalize the earlier agreements between Murphy and Fedco, and to insure to the extent possible the separate nature and independence of petitioners. To this end the agreement provided, among others, that Murphy would be permitted to sell stock in petitioners so long as he retained only voting control, and that license difficulties (or suspension) or damages sustained by one petitioner would not permit Fedco to cancel concession *171 rights as to any other petitioner. Ultimate Findings of Fact In forming petitioner corporations Ray Murphy was principally motivated by a bona fide desire to obtain greater flexibility and more liquidity in his liquor concession investment, to improve his over-all net worth and to protect himself to the greatest extent which he thought possible from either adverse liquor legislation or orders of the California A.B.C. Board. Accordingly, the principal purpose for the acquisition of petitioner corporations was not evasion or avoidance of Federal income tax. Opinion Respondent has determined that the principal purpose for which Ray Murphy acquired the four petitioner corporations was evasion or avoidance of Federal income tax. Based on this determination he has, under authority of section 269(b), Internal Revenue Code of 1954, allocated among them a single minimum corporate surtax exemption. Respondent's position herein is that prior to their formation petitioners were part of a single integrated business enterprise and that the principal purpose for the division of that enterprise was to avoid Federal income taxes by means of obtaining multiple corporate *172 surtax exemptions. Petitioners contend that bona fide business considerations, rather than tax avoidance, prompted their formation. As thus narrowly framed, the issue is whether the petitioners have established by a preponderance of the evidence that a tax avoidance purpose did not exceed in importance any other purposes. Section 1.269-3, Income Tax Regs.; Commodores Point Terminal Corporation, 11 T.C. 411 (1948). Our ultimate finding is dispositive of this issue. We find Ray Murphy to be a man whose expertise in the liquor field cannot be doubted. Prior to the formation of petitioner corporations he was seriously concerned both with the limited flexibility which his existing method of operation provided and with his exposed position as common holder of multiple liquor licenses. Based on his past experience of having had a sizable income but little net worth he desired to place himself in the most liquid position possible, i.e., a position where his investment would become a salable commodity. Murphy expressed his concern and desire to Charles T. Munger, an attorney specializing in commercial matters. Munger saw Murphy's problems as interrelated, *173 and advised as a solution the formation of the four petitioner corporations together with a renegotiation of the Fedco concession agreement. By such an arrangement it was the expectation of both Munger and Murphy that the value of Murphy's investment would be increased by virtue of his being able to sell stock in one or all of petitioners without sharing the management, without Fedco consent, and without A.B.C. Board approval. Further, Munger advised that by incorporating the four petitioners, each to hold in its own name a separate liquor license, Murphy might avoid the difficulties which were inherent in the individual holding of multiple licenses. Respondent has argued that the experience of petitioners subsequent to their formation (i.e., that no part of their stock has been sold and no license difficulties have been encountered by them) disproves the reality of Murphy's stated business purposes in forming them. We disagree. While it may be that some of Murphy's reasons for incorporating petitioners were not well founded, this does not nullify the existence of the reasons. Sno-Frost, Inc., 31 T.C. 1058 (1959). Both Murphy and Munger believed in good faith that *174 incorporation of the four petitioners, coupled with a revised Fedco concession arrangement, was the way to produce the maximum flexibility and high asset value desired by Murphy. The evidence of record clearly establishes that Murphy would have created the petitioners absent any tax advantage. On balance, it is our view that petitioners were not acquired for the principal purpose of evasion or avoidance of Federal income tax within the purview of section 269. Decisions will be entered for the petitioners in all dockets herein. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Winfed Distributing Co., Docket No. 92975; Oxford Distributing Co., Docket No. 92976; and Old Fed Distributing Co., Docket No. 92977.↩
2. Limited to Federal, State, and Local Government employees.↩