Per Curiam:
This case was referred to Trial Commissioner William E. Day with directions to make findings of fact and recommendations for conclusion of law. The commissioner has done so in a report and opinion filed on December 15, 1966. Defendant has filed no exceptions to or brief on this report and the time for so filing pursuant to the Rules of the court has expired. On January 27, 1967, plaintiff filed a motion that the court adopt the commissioner’s findings of fact, opinion and recommended conclusion of law to which defendant has not responded within *849 the time as set forth in the rules and the case has been submitted to the court without oral argument. Since the court agrees with the commissioner’s findings, opinion and recommended conclusion of law, as hereinafter set forth, and on the basis of the decision of the court in Alinco Life Insurance Co. v. United States, 178 Ct. Cl. 813, 373 F. 2d 336 (1967), it hereby adopts the same as the basis for its judgment in this case. Plaintiffs are therefore entitled to recover and judgments are entered for plaintiffs with the amounts of recovery to be determined pursuant to Pule 47(c).
OPINION OP COMMISSIONER*
Day, Commissioner:
These nine cases, which were consolidated for trial, are suits for refund of income taxes paid pursuant to assessments for income tax deficiencies made by the Commissioner, and involve the years 1960,1961 and 1962. The Commissioner of Internal Eevenue has determined that the deficiencies should be assessed because, in his view, the principal purpose of creating the nine corporations was to evade income tax by obtaining a separate surtax exemption for each corporation. The plaintiffs paid the additional taxes assessed, plus interest, and sue for their recovery after claim for refund was timely filed and disallowed.
In their income tax returns for the years in suit, the plaintiffs claimed entitlement to one $25,000 surtax exemption for each plaintiff. The Commissioner’s determination allowed one $25,000 surtax exemption for all nine plaintiffs, as if only one corporation had been created.
The plaintiffs contend that there were good and sufficient business reasons for the creation of nine separate corporations and that the principal purpose of incorporation was not “evasion or avoidance of Federal income tax” within the meaning of section 269.
The facts are set forth in the detailed findings and will be summarized.
Around the turn of the century, Max Shapira founded a retail clothing and drygoods store at New Haven, Kentucky. In 1915, the store was moved to Springfield, Kentucky. Max *850 Shapira was joined by his son, Gary, and the store was operated (as a partnership under the name “M. Shapira & Son.” In 1921, Max Shapira died and his wife, Annie, succeeded to his interest in the partnership. Gary had four brothers — George, Ed, David and Mose — in that order. As each younger brother attained majority, he was admitted to the partnership as an equal partner. In 1951, Annie Shapira died and her five sons acquired her interest in the business in equal proportions. The business was thereafter operated under written articles of partnership.
Beginning in 1928, additional stores were opened from time to time in small Kentucky county seats. By February 1959, 13 stores were operated: two each in Bardstown and Elizabethtown and one in each of nine other towns. These stores were the usual small town family clothing stores. They sold medium- and low-priced ready-to-wear clothing (including shoes) for men, women and children, yard goods, other staple household drygoods, such as sheets, towels, rugs, blankets, curtains, draperies, and a few items of luggage, toys and furniture.
Each store building was leased. The lessor in all but one instance, was unrelated to the Shapira family.
Prior to 1935, a central warehouse serving all stores was maintained at Springfield, Kentucky, where the main offices of the partnership were located. In that year, both the warehouse and the main offices of the partnership were moved to Louisville, into a combined warehouse and office building acquired by the partnership.
Gary Shapira, the eldest brother, was the chief executive of the business, and was responsible for making most of the policy decisions. That is not to say that this was accomplished without discussions among the partners, because such discussions were had at least weekly among all of the partners. The younger brothers, however, looked to Gary for leadership, which he provided.
Until 1959, Gary Shapira closely supervised all store managers, hired and fired all employees, and regularly visited all stores. The brothers, George, David and Mose, shared responsibilities in the buying of merchandise, dividing among them the class of merchandise each purchased. Ed Shapira, *851 while participating in the weekly partnership meetings, usually on weekends, devoted most of his time to the operation and management of the Shapira family-owned, or closely held, whiskey distillery at Bardstown, Kentucky.
In 1949, Curtis Pittman was employed by the partnership as comptroller. Not related to the Shapira family by blood or marriage, he came to the firm from the accounting firm which had done the accounting work for the partnership for some time. From the beginning of his employment by the partnership, in addition to the accounting functions which he performed, he was an assistant to Gary Shapira and usually accompanied Gary on his regular visits to the various stores. One or two days per week were devoted to such visits. Pittman was consulted on management and policy decisions and was kept informed of any projected plans for the operation of the business enterprise carried on by the partnership.
On weekends, the five partners regularly assembled to talk over the business operations of the partnership and also any projected plans for the future. Pittman usually attended these meetings. No minutes were kept of such meetings. Over the years 1957 and 1958, at such meetings, Gary had advanced the idea of the incorporation of each retail store operation. Discussions continued concerning this subject and in the six-month period prior to incorporation it was discussed at practically every meeting of the partners.
Gary was concerned about his own estate planning problems. In 1957, he and his wife were 56 years of age and had two children. George Shapira was 54 years old and unmarried. Ed Shapira and his wife were 50 and had two children. David Shapira and his wife were 43 and had two children. Mose Shapira and his wife were 42 years old and had one child.
In December 1958, the partners, influenced in their consideration by Gary, concluded that a rearrangement of their business should be accomplished, from operating the retail stores under the partnership to the incorporation of each store which was showing a profit, in order to achieve continuity of the business operation upon the demise of any partner.
*852 The total sales of the partnership for each of the taxable years 1956,1957 and 1958 exceeded two and one-half million dollars. No single store, during these years, had sales in excess of one-half million dollars.
The partners were also concerned over the increasing possibility of the enactment of legislation covering the employees of small retail stores under the minimum wage laws, which employees were not then affected by such legislation. It was felt that this was a real threat to the profitability of the store operations which could 'be countered by the separate incorporation of each individual store.
The partners also believed that such separate incorporation of the stores would enable the business to better avoid the possibility of the unionization of their employees.
The partners also 'believed that it would further the business of the store operation if they might achieve more of a local image for each individual store, identifying it to a greater degree with the place of its operation. In addition, they felt that they could increase store managers’ incentive toward greater profitability of the individual stores with a profit-sharing plan, by offering store managers an opportunity to purchase shares of stock of the individual store operation. The partners believed that all of the objectives mentioned above could best be accomplished by separate incorporation of the individual stores.
After the incorporation of the stores, three of the managers were given an opportunity to and did purchase two shares out of a total (for the three stores respectively) of 250, 195 and 115 shares. The expansion of the stock purchase plan for the managers was halted after incorporation because of the statements made to Pittman by Internal Revenue agents during 1960 and 1962 examinations of the store books.
After deciding in 1958 on the separate incorporation of the individual stores, the partners and Pittman in December of that year, called in their attorney and accountants to discuss the matter. The pros and cons of the move to incorporate were discussed in a 2^- to S-hour meeting at which Gary led the discussion for the partners. The availability of a surtax exemption for each store was discussed. The partners, *853 at this meeting, decided to go forward with the incorporation of the plaintiff companies.
Upon the formation of the store corporations, Gary was elected president of each. He and each brother were elected as officers of each corporation.
On February 1, 1959, the partnership transferred to the plaintiff corporations the assets and liabilities (except merchandise inventories) employed by the store at which each corporation was to do business, in exchange for capital stock equal to the book value of exchanged assets (which included furniture and fixtures, leasehold improvements, prepaid expenses, accounts receivable, cash on hand and the lease on such store). The partnership received the following amounts of capital stock in the plaintiff corporations at $100 per share par value.
The Louisville Store, Liberty, Ky- $6,886.30
The Hub Store, Elizabethtown, Ky_ 11,114.98
The Lincoln Shop, Bardstown, Ky- 5,997.53
The Louisville Store, Bardstown, Ky- 12,436.13
The Louisville Store, Danville, Ky_ 24, 723. 04
The Louisville Store, Harrodsburg, Ky- 7, 015. 64
The Louisville Store, Lawrenceburg, Ky- 12,356. 59
The Louisville Store, Springfield, Ky- 7,472.40
The Peoples Store, Elizabethtown, Ky- 19,290. 04
The Lincoln Store, Harrodsburg, Ky_ 2, 512.93
The Louisville Store, Princeton, Ky- 20, 684.44
On February 1, 1959, each store corporation purchased for cash from the partnership the inventory on hand in the store which the corporation was to operate. The cash amounts paid for such inventory were as follows:
The Louisville Store, Liberty, Ky_$28, 836. 57
The Hub Store, Elizabethtown, Ky_ 38, Oil. 24
The Lincoln Shop, Bardstown, Ky_ 17, 512. 82
The Louisville Store, Bardstown, Ky_ 40, 610.19
The Louisville Store, Danville, Ky_, 54, 923.46
The Louisville Store, Harrodsburg, Ky- 31,519.20
The Louisville Store, Lawrenceburg, Ky_ 39, 970.38
The Louisville Store, Springfield, Ky__ 26,484. 76
The Peoples Store, Elizabethtown, Ky- 48, 731. 38
The Lincoln Store, Harrodsburg, Ky_ 15,691.32
The Louisville Store, Princeton, Ky_ 28,502.27
*854 Each corporation borrowed the entire amount necessary to purchase its opening inventory, from a bank in Louisville, for which the bank took only unsecured notes from each borrower. The payment of the notes was not guaranteed by the partnership, any of its partners, nor anyone else. By January 31,1963, the loans made to seven plaintiffs had been paid in full. Two plaintiffs still owed $15,000 each. They were: The Louisville Store, Harrodsburg, Kentucky and The Peoples Store, Elizabethtown, Kentucky.
The partnership continued in business as a partnership with the five brothers as partners. It furnished buying, warehousing and administrative services pursuant to written agreements, to each plaintiff corporation. For these services a monthly service fee was paid by each plaintiff, prorated on gross sales of each plaintiff to the gross sales of all stores including those two (Owensboro and Winchester) still owned by the partnership.
Although the officers of the plaintiff companies (except Ed Shapira) continued after incorporation, there was much less supervision of the individual stores by the Shapiras and much more control of the operation of the individual stores by the store managers. They had a greater hand in determining the price at which goods should be sold. They decided upon the hours of opening and closing of the store. They were responsible for hiring and firing of store employees. In addition, they had most of the contacts with the advertising media for which they prepared most of the copy.
In November 1960, the partnership purchased from each plaintiff corporation, for cash at current book value, sufficient additional shares to enable an equal distribution of shares among the five Shapira brothers. Tins distribution took place immediately thereafter.
On December 19,1960, Gary Shapira died testate. Under the articles of partnership, his surviving brothers purchased Gary’s partnership interests and continued the partnership business. Gary’s stock in the plaintiff corporations was disposed of in accordance with his will, to a bank as executor and trustee for the benefit of his wife and daughters.
*855 Each of the plaintiff corporations kept its books on the accrual method of accounting, filed timely federal tax returns for the years involved (fiscal years 1960,1961 and 1962) and paid 'the tax shown thereon to be due. Finding that the incorporation of the individual retail stores was an acquisition made to evade or avoid income tax within the meaning of section 269 (of the 1954 Code) and allowing but one surtax exemption as to the entire group of plaintiff corporations, the Commissioner of Internal Revenue assessed deficiencies against each plaintiff. The additional amounts assessed were paid (as shown in finding 4), claims for refund were timely filed and disallowed.
In imposing the surtax on the taxable income of a corporation, section 11(c) of the Code provides an exemption of $25,000. In section 269 (a), it is provided that if a person (or persons) acquires control of a corporation and the principal purpose of such acquisition is evasion or avoidance of federal income tax by securing the benefit of a deduction credit, or other allowance which such person or corporation would not otherwise enjoy, then the deduction credit, or allowance, shall not be allowed. For the purposes of section 269 (a) (1), control is defined as ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote. Dillier, 41 T.C. 762, 784 (1964). Acquisition of control as used in section 269, includes the formation of new corporations. James Realty Co. v. United States, 280 F. 2d 394 (1960), Kessmar Construction Co., 39 T.C. 778 (1963), Dillier, sufra.
It is the burden of the plaintiffs to establish by a preponderance of the evidence that among the reasons underlying the incorporation of the individual retail store corporations the principal purpose was not to obtain the benefit of the surtax exemptions. The plaintiff has met this burden by showing that there were many other sound business reasons for the incorporation of the individual stores and that the securing of surtax exemptions for each plaintiff was not the frmeifal purpose of such incorporation. All of the evidence produced at trial was produced by the plaintiff except for three sample bank checks on which the remittance advice con *856 tained the legend: “address all correspondence regarding this payment to M. Sbapira & Sons, Heaven Hill Building, 528 West Main Street, Louisville, Kentucky.” Tbe sample checks were “National Cash Register bookkeeping type checks” on which the name of the drawer and the name of the bank were placed on the check by the NCR 'bookkeeping machine. Since the partnership continued to perform the accounting services of each plaintiff after incorporation, the legend quoted above, it would seem, loses any significance. The defendant, accordingly, relies on the weakness or failure of the plaintiffs to prove the allegations of their petitions. I am convinced that the facts show many valid business reasons which were served 'by the incorporators of the plaintiffs and demonstrate rather clearly that the principal purpose of organizing the separate corporations was not to evade or avoid taxes. That is not to say, however, that the incorpo-rators were not aware of the benefits of the surtax exemptions, because after they had concluded for such business reasons to incorporate, they consulted with their attorneys and accountants who discussed these benefits with them.
Congress, in considering the Revenue Act of 1964, reviewed the application of the provisions of section 269, concluding •that there were indeed legitimate business reasons in the use of multiple corporations where corporations owned or controlled by the same interests, as here, conduct the same type business in different geographical locales, as here. The Senate Finance Committee made the following comment in this connection:
# Hí Jfc H* ❖
While the House and your committee recognize the advantages of use of multiple corporations, it is believed, as it has been in the past, that, where corporations owned and controlled by the same interests engage in different businesses in the same area or conduct the same type 'business in different geographical locales, there are legitimate business reasons for use of separate corporations and, therefore, the separate corporations should generally be recognized as separate taxpayers, retaining the benefit of use of multiple surtax exemptions. However, the House and your committee do not intend to encourage the formation of these multiple corporations and there *857 fore propose to apply higher tax rates to corporations which are members of an affiliated group of corporations. Of course, nothing in this bill is intended as changing the application of sections 269, 1551, or 482 if the multiple corporation form of organization is adopted to avoid taxes.
*****
Sen. Rep. 830, 88th Cong. 2d Sess., pp. 149-150, Cum. Bull. 1964-1 (Part 2) pp. 653-654.
The House Ways and Means Committee adopted similar language in its report on the same subject. See H.R. Rep. No. 749, 88th Cong. 1st Sess., Cum. Bull. 1964-1 (Part 2) p. 242.
The facts in this case as found and as detailed above find even stronger support for the plaintiffs’ position here than the facts in the case of V. H. Monette & Co., 45 T.C. 15 (1965), where the plaintiff prevailed on the issue here involved. In that case, after incorporation of the multiple corporations (there were six), business was still conducted under the old name, books and records were maintained at the home office, no bank accounts were ever maintained in the names of the individual companies and bills were sent to the home office for payment. The Tax Court, nevertheless, found that the multiple companies were formed not as shams or tax avoidance devices, citing Bush Hog Mfg. Co. 42 T.C. 713 (1964).
Estate planning considerations were found to be valid business purposes supporting the allowance to newly formed corporations of the right to the benefit of the separate $25,000 surtax exemptions in Cronstroms Mfg. Co., 36 T.C. 500 (1961). So also in this case, the estate planning considerations were a valid business purpose of the plaintiffs’ incorporators.
The evidence shows that the incorporators were genuinely concerned about the possibility of the coverage of their employees under the Federal Minimum Wage legislation. They believed that the multiple incorporation of its retail stores would help them to avoid the adverse effects of such proposed legislation. This is a valid purpose in the formation of such separate corporations. See Fedcal Dist. Co., 22 T.C.M. 935 *858 (1968). Likewise, they believed that they could better avoid the possibility of the unionization of their employees if separate corporations were formed. The Tax Court in a case involving a similar situation found such a reason for separate incorporation to be a valid business purpose quite apart from the tax avoidance or evasion purposes referred to in section 269 of the Code. Pre-Mixed Concrete, Inc., 21 T.C.M. 1601 (1962).
The defendant argues in effect that the incorporators of the plaintiff companies could have accomplished all proper business objectives by the formation of but one corporation and point to the successful J. C. Penney firm as an example of one corporation operating many retail branches. The fact that Penney can operate a successful retail business under one corporate entity does not negate the valid business purposes which might prompt the formation of multiple corporations.
Since Gary Shapira was deceased at the time of trial, the defendant in its brief takes the position that it was the burden of the plaintiffs in attempting to show motives of the partners that it be done only by the remaining partners. As is shown in the findings, Gary was the eldest of the partner-brothers, his judgment was respected and followed by the other partner-brothers, as one of them, George Sha-pira, testified. Most of the testimony bearing upon the motives of Gary in persuading the other partners upon the course of action resulting in the incorporation of the retail stores came from Curtis Pittman, a trusted employee who spent the greater part of each working day with Gary. His testimony was competent, it was believed, and was probably the 'best evidence of such purposes available to the plaintiff. Mutual Life Insurance Co. v. Hillmon, 145 U.S. 285 (1892).
It is determined that the valid business purposes for incorporating the plaintiff companies detailed in the findings far outweigh any tax consideration which the incorporators might have had. The purpose of incorporation of the plaintiff companies was, therefore, not principally to avoid or evade income tax within the meaning of section 269. Ac- *859 cordiugly, each plaintiff is entitled to the benefit of the $25,000 surtax exemption.
FINDINGS oe Fact
1. For many years prior to 1959, M. Shapira & Sons, a partnership, operated family clothing and drygoods stores (junior department stores) in a number of small towns in Kentucky. On January 23, 1959, the members of the partnership, five Shapira brothers, organized 11 corporations under the laws of Kentucky, and on February 1, 1959, each corporation commenced the operation of a junior department store at a single, separate location where formerly the partnership had operated such a store.
>2. The corporations, the name of the store which each commenced to operate, the towns in which the stores were located (in every case a county seat) and the population of the county (trading area) which each store served were:

*860 Only 9 of tbe 11 corporations are plaintiffs in these proceedings. The Lincoln Store of Harrodsburg, Ky., Inc. and the Louisville Store of Princeton, Ky., Inc., had no taxable income for the years here involved. The taxable incomes, as shown on the tax returns, of each of the corporations for the years at issue were:

3. Each of the 11 store corporations kept its books and records on the accrual basis of accounting and filed timely federal income tax returns for the years here involved with the District Director of Internal Revenue for the District of Kentucky at Louisville, Kentucky, and paid the taxes shown thereon to be due.
4. Following a determination that “the incorporation of the 11 outlets was an acquisition made to evade or avoid income tax within the meaning of section 269 of the Internal Revenue Code” and that only one surtax exemption should be allowed as to all of the corporations, the Internal Revenue Service determined additional assessments of federal income taxes against the 9 plaintiffs in the amounts and for the taxable years set forth below. These additional taxes, together with interest in the amounts set forth below, were thereafter paid on the dates indicated:

*861

*862

5. On January 23 and March 5,1963, plaintiffs filed claims for refund of these taxes and interest. On October 4, 1963, these claims were disallowed in full.
•,6. At the time plaintiffs were incorporated and for a number of years prior thereto, the five Shapira brothers were equal partners in M. Shapira & Sons. They were, in order of descending age: Gary, George, Ed, David and Mose Shapira.
,7. The partnership enterprise was the outgrowth of a single retail store established by the father, Max Shapira, at New Haven, Kentucky, in 1905. In 1915, the store was moved to Springfield, Kentucky; Max Shapira was joined in the business by his eldest son, Gary, and a partnership was begun under the firm name of M. Shapira & Son. Max Shapira died in 1921 and his wife, Annie, succeeded to his interest in the business. Thereafter, as each of the younger brothers came of age, he was admitted as an equal partner. In 1951, Annie Shapira died and her sons acquired her interest in *863 the business in equal proportions. Thereafter, the business was operated under articles of partnership dated December 10,1951, and amendments thereto dated January 3,1956.
8. Commencing in 1928, additional stores were opened from time to time in small Kentucky towns. On February 1, 1959, the partnership operated 13 stores, the 11 referred to in finding 2, supra, and stores in Winchester, Kentucky, and Owensboro, Kentucky.
9. The articles of partnership provided for fixed individual “salaries” for the partners in varying amounts. The amounts were fixed as a result of discussions among the partners, led by Gary Shapira, the eldest brother. They were amended from time to time. Income of the partnership in excess of partners’ “salaries” was divided equally among the partners.
10. The stores were small town family clothing stores. They sold medium- and low-priced ready-to-wear clothing (including shoes) for men, women, infants and children; yard (piece) goods; other staple household drygoods such as sheets, towels, rugs, blankets, curtains and draperies; and a few items of luggage, toys and furniture.
11. There were substantial variations from store to store in the quality and price of the merchandise carried, as well as in the manufacturers’ lines, due to differences in economic statuses of the communities in which the various stores operated. In a predominantly farming community as, for example, Liberty, emphasis was placed on the sale of inexpensive work clothes. In an industrialized (Owensboro) or a college (Danville) town, emphasis was placed on the sale of more expensive, name brand, stylish clothes. However, all of the stores have always carried principally staple merchandise, that is, merchandise which is not subject to rapid fashion changes.
,12. Both before and after incorporation, each store was maintained on premises consisting of one, two or three floors, and leased from persons who were not associated with or related to plaintiffs or the Shapira family, with one exception. After the incorporation of each separate store, the same premises were utilized by the new company.
13. In each of three towns — Bardstown, Elizabethtown and Harrodsburg — two stores were maintained. There *864 were differences in the quality and price of the merchandise which each store carried. The stores had different locations within the town and carried different brands of merchandise. The Louisville Store in Bardstown carried a full line of department store merchandise; The Lincoln Shop of Bardstown carried only ready-to-wear merchandise for women and children. In Elizabethtown, The Peoples Store carried better-quality, higher-priced merchandise than did The Hub Store. In Harrodsburg, The Louisville Store carried better-quality, higher-priced merchandise than did The Lincoln Store.
14. Prior to 1935, a central warehouse serving all the stores was maintained at Springfield, Kentucky, and the headquarters of the enterprise were maintained there. In 1935, the warehouse and headquarters were moved to Louisville, Kentucky, to a combined warehouse and office building acquired there. Thereafter, the purchasing and inventory warehousing functions of the enterprise were coordinated and implemented at the Louisville location. The firm’s accounting- and other general administrative activities were also performed there. The decision to move the warehouse and headquarters to Louisville was made by Gary Shapira.
15. During the 194Q’s and 1950’s (until 1959) Gary Sha-pira, the eldest brother, was the chief executive of the business and made policy decisions. During this period, none of the partners directly managed any of the stores. Gary, however, closely supervised all of the store managers. He frequently visited the stores, devoting one or two days each week to this work. He exercised tight control over store appearance and merchandise displays, did the hiring and firing of all managers and sales personnel, and supervised their activities during his visits to the stores. He kept himself closely informed concerning all major store expenses (such as rent, repairs and renovations to store buildings) and the compensation paid to each employee. All invoices for store merchandise cleared his desk. He made the decisions whether and where to open new stores. The other partners looked to him for leadership and respected his judgment and acquiesced in his decisions.
16. During the years prior to 1959, George Shapira was engaged primarily in buying merchandise for the firm. He *865 also gave Gary Sbapira some assistance in handling the financial and administrative affairs of the partnership. David and Mose Shapira devoted themselves to buying merchandise. Each of the buyer-partners — George, David and Mose — was responsible for procuring merchandise for particular store departments or merchandise classifications. George bought lingerie, piece goods, domestics, millinery and toys. David bought ladies’ ready-to-wear. Mose was responsible for buying men’s goods. Ed Shapira devoted himself primarily to managing a family-owned distillery located in Bardstown, Kentucky, where he lived, but kept himself informed on the partnership affairs through frequent talks with his brothers.
17. Curtis Pittman was employed by the partnership in 1949 to fill the position of comptroller. He is not related by blood or marriage to the Shapiras. Prior to 1949 he had been employed by the public accounting firm serving the partnership. From the time of his employment he acted as Gary’s assistant in managing the financial and administrative affairs of the enterprise. He worked very closely with Gary at the Louisville office and accompanied him on visits to the stores. Pittman participated in making management and policy decisions of the firm and was continuously and completely informed by Gary of the latter’s plans for the operation of the business enterprise. He was also intimately acquainted with Gary’s personal financial matters, preparing personal net worth statements for him at regular intervals. He was similarly acquainted with the personal financial matters of the other partners and prepared similar net worth statements for each partner.
18. During 1957 and 1958 all the partners and Pittman attended weekend meetings held in Louisville at which the partnership’s business affairs were discussed and business decisions made. These meetings were informal and no minutes or other notes were ever made as to what was discussed or decided at them.
19. Commencing with the year 1957, and continuing through 1958, both at the weekly partnership meetings and in private conversations with Pittman, Gary expressed dissatisfaction with the partnership form of business organi *866 zation in which the enterprise was being conducted. Commencing in January 1957, Gary began pointing out in these discussions the desirability of incorporating each of the stores as a separate, distinct corporation entity. In the six-month period prior to the incorporation of the separate stores, this subject was discussed at practically every meeting of the partners.
20. Gary’s dissatisfaction with the partnership form of business organization stemmed from a number of roots. One was his personal estate planning problems as they related to the continuity of the business enterprise. In 1957, Gary and his wife were 56 years old, and they had two daughters, aged 14 and 19. George was 54 years old, unmarried and had no children. Ed and his wife were 50 and had two minor children. David and his wife were 43 and had two minor children. Mose and his wife were 42 and had a six-year-old daughter.
21. In 1957, Gary Shapira consulted a lawyer for the purpose of preparing his will. After this consultation, he expressed concern to Pittman and to his brothers over the fact (brought out in his discussions with the lawyer) that upon his death his surviving brothers would, under the terms of the partnership agreement, have the right to acquire equally all bis interest in the assets and business of the partnership enterprise, leaving his wife and children without an interest of any kind in the family business. Gary wished to prevent this from occurring. He also knew the effects upon the partnership of the death of a partner after his mother died in 1951. Gary was also concerned over the possibility that payment for the deceased partner’s interest in the business might create a deficiency in the partnership’s working capital, threatening the financial soundness of the business. Gary believed that these consequences could be averted by divorcing the wholesale functions of the enterprise (buying and warehousing) from the retail functions (the stores) through the organization of corporations to conduct the retail stores of the business. This would permit the partners, at their death, to bequeath to their immediate families, in the form of corporate stock, a very substantial portion of *867 the family business. It would also better enable the enterprise as a whole to continue in an orderly fashion upon the death of a partner since the amount of working capital which would have to be withdrawn from the business to purchase the deceased partner’s interest would be greatly reduced. The wholesale function of the enterprise depended primarily on the personal buying skills and experience of the individual partners. If left in the existing partnership, a deceased partner’s interest therein would be acquired by the surviving partners. This, the partners believed, was as it should be, for Gary and the other partners believed that their heirs should not share with the surviving partners in any income derived from their personal efforts. On the other hand, stock in store corporations represented a capital investment producing profit under the direction of hired managers, and was a suitable type of asset to pass to the heirs of the partners who were persons without business experience.
22. In December 1958, the partners, directed in their thinking by Gary, concluded that by organizing a separate corporation to operate each separate partnership store, they would achieve a rearrangement of their business enterprise which would allow them to pass to their immediate families at their deaths a substantial portion of the family business in a flexible manner suited to each family, and which would, avoid the threat to the continuation of the business upon the death of a partner stemming from diminished working capital. The desire to achieve such flexibility in planning the distribution of their personal estates and to avoid such threat to the continuation of the business was a major purpose for the formation of the store corporations and the transfer to them of the store businesses.
23. For each of the taxable years, 1956,1957 and 1958, the total sales of the partnership exceeded two and one-half million dollars. No single store operated by the partnership during this period had sales totaling as much as $500,000.
24. From 1956 through 1958 the partners, particularly Gary, and Pittman became increasingly and actively concerned over legislation then pending in Congress providing for elimination of the exemption enjoyed by the retail industry from the minimum wage and hour provisions of the *868 Fair Labor Standards Act. Under this statute as it then existed, none of the partnership’s employees was covered by the law’s minimum wage and hour provisions. Through Washington “newsletters,” trade journals and general news media, the partners became aware, as early as January 1957 of efforts by labor organizations to persuade Congress to extend the minimum wage and hour coverage of the law to retail establishments which were then exempt. In 1957 legislation designed to eliminate the retail exemption was introduced in Congress and referred to a Senate Labor subcommittee. The partners and Pittman promptly became aware of it. During 1957 various changes in the law were urged upon Congress ranging from the proposal of the Department of Labor to extend coverage to retail businesses with as many as 100 workers and one million dollars in interstate purchases, to a proposal introduced by Senator Morse which based coverage solely on annual sales of at least $500,000. In April 1957, then Senator Kennedy, chairman of the subcommittee, introduced a compromise bill, the details of which were promptly brought to the attention of Gary and Pittman, which would extend minimum wage coverage to retail firms with annual sales in excess of one million dollars. In May 1957 the Kennedy bill was reported out of the subcommittee and referred for action to the full Senate Labor Committee. The Labor Committee failed to agree on the bill and Congress adjourned without acting on it. In 1958 the Kennedy bill to amend the law was actively considered by Congress and elimination of the retail exemption in the Fair Labor Standards Act was widely predicted by the news media currently being read by Gary and Pittman. Gary and Pittman were kept contemporaneously (aware of all the legislative developments recited above.
25. During 1957 and 1958 retailers throughout the country believed that the retail exemption from the minimum wage and overtime provisions of the Fair Labor Standards Act would be modified or eliminated. They were actively and gravely concerned about this prospect. They believed this would have serious adverse effects on the profits of their businesses. This concern was felt by Gary in respect to the *869 partnership business of M. Shapira & Son. In March 1957, Gary wrote Kentucky Senator Cooper urging him to vote against any proposed extension to retailers of the minimum wage and hour provisions of the statute. At the same time similar letters were sent by Gary to other members of the Kentucky delegation in Congress.
26. Gary believed that compliance by the partnership stores with the minimum wage and hour requirements of the federal law would cause payroll costs to increase at least 40 percent and probably more, and that this would substantially affect adversely the partnership’s earnings and profits. This was because partnership store employees worked for approximately 50 cents an hour, plus commission, (a total compensation of less than 60 cents an hour). Their work was substantially in excess of 40 hours (the work week permitted without overtime compensation by the federal law). The stores sold their merchandise for prices reflecting small markups over cost. As a group, the stores during the period 1957 to 1958, operated on a gross margin of approximately 30 percent (31.73 percent for 1956; 30.43 percent for 1957 and 29.71 percent for 1958). This was about 5 or 6 percentage points less than that enjoyed by the typical junior department store. Net profits from total store operations were about 7 percent of sales in 1956; 6 percent in 1957 and 4% percent in 1958. During this same period the compensation of store employees (exclusive of the manager) averaged 5.7 percent of sales. An increase in the hourly wage rate of employees, from 60 cents to one dollar, the minimum specified in the federal law, and payment of overtime for hours worked in excess of 40 each week, would increase the ratio of selling expense to sales and substantially reduce the already narrow net profit margin of the stores. The adverse effects of such increased labor costs would not be offset by increasing employee productivity or increasing the prices at which the partnership sold its merchandise. The staple merchandise which comprised the principal inventory of the stores, was bought by the public on the basis of price as opposed to style. It was, therefore, subject to intense price competition. The partnership stores would not have been able to raise prices *870 to offset wage increases without losing sales. The physical facilities of the stores were not adaptable to customer self-service merchandising practices and, therefore, the partnership did not have open to it this approach for offsetting increased payroll costs.
27. In December 1958, the partners, directed in their thinking by Gary, concluded that by organizing a separate corporation to operate each separate partnership store so that no single store corporation would have annual gross sales equaling one million dollars, they would avoid the application of the oncoming amendments to the Federal Minimum Wage and Hour Law. The desire to avert the adverse effect of this proposed change in the law was a major purpose for the formation of 'the store corporations and the transfer to them of the store businesses.
28. During the years 1956 through 1958, local units of the Teamsters Union and Eetail Clerks Union organized the employees of many wholesale and retail merchants in Louisville. Drives were successfully conducted by the Teamsters Union to organize the employees of wholesale firms located in the near vicinity of the partnership’s Louisville warehouse and headquarters. The partners, particularly Gary, and Pittman were aware of these union activities as they occurred, through local newspapers, personal observations and discussions with local business representatives.
29. Under the circumstances which existed, the partners believed that either the Teamsters Union or the Eetail Clerks Union would soon attempt to organize the Louisville employees of M. Shapira & Sons. They further believed that unionization of the employees working in the Louisville office and warehouse would lead to unionization of the employees working in the stores located in towns throughout Kentucky. The ■ partners believed that unionization would adversely affect their business for a number of reasons. Union representatives would make demands for increased wages which would have to be met. Union' contract provisions would place employees in job classifications with rigid delineations of duties, thus eliminating the existing 'flexible work assignments necessary to the successful operation of the stores. For example, sales clerks were frequently assigned to work on *871 window displays or were reassigned from one department to another within a store. Union contracts would contain seniority provisions requiring the partnership to retain less productive employees in preference to productive ones in the same store during slack seasons. The partners decided to take steps to avoid unionization or to make it as difficult as possible. They believed that an arrangement whereby separate corporations operated each store, would necessitate separate collective bargaining negotiations by the union with each separate corporation, no single one of which had many employees (prospective union dues payers) and that such a corporation would not 'be an attractive target for the unions.
30. The desire of the partners to avoid unionization of the store employees or to make it as difficult as possible, was one of the important reasons for the formation of the store corporations and the transfer to the corporations of the business and assets of the stores.
31. During 1957 and 1958, the partnership experienced difficulty in securing and retaining experienced and capable store managers. In these years it had several managerial changes in stores at Princeton, Owensboro, Springfield, Harrodsburg and Bardstown. The partners believed that the low profits in these years of the Harrodsburg, Bardstown and Owensboro stores and the failure of the Winchester store to show any profit were largely due to poor management.
32. Experienced, capable store management is the single most important factor in the success of junior department stores such as those being operated by the partnership in 1957 and 1958. In these years there was a shortage of capable, experienced store managers in the retail field. This condition had existed since the early 1950’s and was due to the expansion of large retail chain store enterprises, virtually all of which had advantageous pension and profit-sharing plans and numerous other fringe benefits for store managers.
33. It had been, prior to the incorporation, the partnership’s policy to pay to its store managers a bonus at the end of each year, equal to one percent of the gross sales of each store. This was continued after the incorporation by each of the plaintiff companies.
*872 34. In March. 1960, Gary and Pittman met with the managers of The Hub Store of Elizabethtown, Ky., Inc., The Lonisville Store of Danville, Ky., Inc. and The Peoples Store of Elizabethtown, Ky., Inc. Gary, acting for the plaintiff stores, offered each manager two shares of stock in the particular store which he managed. At that time there were 250 shares outstanding of The Louisville Store of Danville, Ky., Inc. with a book value of $136.55 per share, 195 shares outstanding of The Peoples Store of Elizabethtown, Ky., Inc., with a book value of $162.37 per share, and 115 shares outstanding of The Hub Store of Elizabethtown, Ky., Inc. with a book value of $195.09 per share. The shares were offered at their book value. The three managers wished to acquire the stock but none had the cash to purchase it. Arrangements were then made for the three managers to pay for the stock out of year-end bonuses or by weekly payroll deductions. In the latter part of 1960, stock certificates evidencing the shares were delivered to the three managers.
.35.-At the time shares of stock were offered to- the three store managers Gary explained to them that this was only the beginning of the store corporations’ plans for stock ownership by store managers and that the development of such plans for stock purchases would be influenced by the incentive it generated.
36. In mid-1960, an agent of the Internal Eevenue Service audited the tax returns of the partnership in the course of which he advised Pittman that the store corporations were lacking in economic reality and should not be recognized for tax purposes. Pittman relayed this statement to the Shapiras.
37. In December of 1960, the store corporations requested a law firm to devise a stock participation plan for the store corporations by which each manager could purchase stock in the corporation which employed him with payments financed over a long term so as to circumvent the inability of the managers to pay cash for the stock. The law firm prepared a memorandum detailing such a plan and in January 1961, furnished copies of it to the corporations and the accounting firm serving them.
*873 38. In early 1962, an agent of the Internal Kevenue Service audited the tax returns of the store corporations. At the conclusion of this audit he expressed the opinion that the stores were not separate corporations for tax purposes.
39. Because of the questions raised by the audits referred to above, no further action was taken by the plaintiffs on the matter of offering of stock to store managers.
40. A desire to inaugurate a plan of stock participation whereby each store manager could acquire stock in the store which he managed, and no other, and thereby to further store manager incentive and thus increase store profits was one of the purposes of the formation of the store corporations and the transfer of the store businesses and assets to them.
41. Eesearch conducted by business analysts in the retail field during the 1950’s indicated that a substantial percentage of potential customers, referred to as “ethical shoppers,” prefer to patronize locally owned, independent stores, or are “personalizing” shoppers who have a bias for one reason or another against large chain store enterprises. These persons patronize a locally owned store because they believe they can establish a warm, close and personal relationship with the store owner with whom they do business.
42. Prior to the formation of the store corporations, the partnership name had been carried in local store advertising, on store letterheads, and was used in local store bank operations and the like, in the form, for example, as: “M. Shapira & Sons, doing business as The Hub Store.” The stores were generally considered by members of the communities in which they were located to be owned by Louisville interests. The plaintiffs, in giving names to the incorporated stores, in changing the letterheads and local bank operations, strove to give each plaintiff a local image.
43. Although the same objective could have been accomplished by use of a single corporation, the partners believed that incorporation of the stores would insulate them, as individuals, and their personal assets from various forms of business liabilities and from tort liabilities in particular.
44. Gary Shapira’s disinclination to continue the entire business enterprise in the partnership form and his suggestions of benefits that could be achieved by forming separate *874 corporations for carrying on the business of each, store were discussed from time to time at the weekly meetings of the partnership throughout 1957 and 1958, and with a greater intensity of discussion in the last six months of 1958.
45. In early December 1958, the partners, guided by Gary, tentatively concluded to reorganize the partnership enterprise into new forms of business organizations whereby separate corporations would carry on the business of each store, but the wholesale function of the enterprise (buying and warehousing) would be continued by the existing partnership. This decision was reached on the basis of the various business advantages which such a plan offered. Gary recommended that the operation of the stores be transferred to separate, newly formed corporations by February 1, 1959, the beginning of the partnership’s next fiscal year.
46. The decision to realign the business organizations carrying on the enterprise fell within Gary’s area of responsibility. The other partners believed that Gary was best qualified to make this decision. They had great confidence in Gary’s judgments. They further believed that Gary’s plan for the future operation of the stores by separate corporations had many business advantages. They agreed with and accepted his recommendations.
47. In late December 1958, after the decision to form the store corporations had been tentatively reached, the partners and Pittman for the first time consulted their attorney and members of their accounting firm about the reorganization plan. The purpose of this consultation was to acquaint the attorney and accountants with the reorganization plan and to inquire of them whether it had any serious business or tax disadvantages. The plan of reorganization had not been discussed with or between anyone other than the Shapiras and Pittman prior to this meeting.
48. One of the accountants present at this meeting was Bernard Plimmelfarb, a certified public accountant, lawyer and former revenue agent. He specialized in handling tax matters for his firm. He had not previously performed any work for M. Shapira & Sons or any of its partners. He *875 was brought to the meeting by Max Waldman, the accounting firm partner in charge of the firm’s work for M. Sliapira & Sons and its partners, for the purpose of expressing his opinion as to the tax aspects of whatever reorganization plan was to be presented.
49. At the conference, Gary opened the discussion and as far as the partners were concerned led the discussion. He described the details of the plan for the formation of separate corporations to operate the stores and explained that it was proposed to have the partnership continue the wholesale function of the enterprise. Advantages and disadvantages of the plan were then brought out and discussed by the attorney and the accountants. The disadvantages pointed out included:
(a) Distributions of earnings and profits to the Shapiras as stockholders of the proposed corporations would be treated as dividends taxable to them at ordinary income tax rates resulting in a double tax on earnings of the stores, whereas only a single tax would be assessed on such earnings if the stores continued to be operated by the partnership.
(b) Added complications and expenses would result from serving a number of small entities rather than a single large one. Separate sets of books, bank accounts, stockholders and board of directors meetings, and additional state filing requirements would be necessary.
(c) The proration and allocation of administrative buying and warehousing expenses would require more careful and accurate treatment than would be necessary for one business entity.
(d) The management of a number of small businesses might require more time and attention of the enterprises’ executives than would the management, of one large business.
■50. The method of computing the federal income taxes for which the proposed corporations would be liable was discussed at the meeting and the Shapiras were told that each corporation would be entitled to a separate surtax exemption if it were formed for valid business purposes. With this in mind, Himmelf arb questioned the partners as to the purposes for the formation of the store corporations.
*876 51. The method of financing the purchase of inventories by the proposed store corporations was also discussed at the meeting.
(52. At the end of the conference, which lasted between 2% to 3 hours, the Shapiras, their attorney and accountants concluded that the advantages flowing from the reorganization plan outweighed the disadvantages and its was decided to put the plan into effect.
53. Upon the formation of the store corporations the partners were elected directors. Gary Shapira was elected president of each corporation. The other brothers were also named as officers. Each corporation adopted bylaws, a corporate seal, and complied with all legal and business requisites for organization. On February 1, 1959, the partnership transferred to the respective corporations the assets and liabilities, except merchandise inventories, employed by the store at which each corporation was to do business, in exchange for the respective corporations’ common capital stock of the par value equal to the partnership book value of the exchanged assets, less liabilities. The assets consisted of furniture and fixtures, leasehold improvements, prepaid expenses, accounts receivable, the lease covering the premises in which each store was operated, and cash on hand in the store and in the local bank. The liabilities assumed in each case were nominal. In this exchange the partnership received the following amounts of common capital stock in the corporations at $100 par per share:
The Louisville Store, Liberty, Ky_ $6, 886.30
The Hub Store, Elizabethtown, Ky_ 11,114.98
The Lincoln Shop, Bardstown, Ky_ 5,997.53
The Louisville Store, Bardstown, Ky_ 12,436.13
The Louisville Store, Danville, Ky- 24,723. 04
The Louisville Store, Harrodsburg, Ky_ 7,015. 64
The Louisville Store, Lawrenceburg, Ky_ 12,356.59
The Louisville Store, Springfield, Ky_ 7,472.40
The Peoples Store, Elizabethtown, Ky_ 19,290.04
The Lincoln Store, Harrodsburg, Ky_ 2, 512.93
The Louisville Store, Princeton, Ky_ 20, 684.44
54. On February 1,1959, each store corporation purchased for cash from the partnership the merchandise inventory *877 then on hand in the store which the corporation was to operate. The cash amounts paid for such inventories were:
The Louisville Store, Liberty, Ky_$28, 836. 57
The Hub Store, Elizabethtown, Ky_ 38,011.24
The Lincoln Shop, Bardstown, Ky_ 17, 512. 82
The Louisville Store, Bardstown, Ky_ 40, 610.19
The Louisville Store, Danville, Ky_ 54,923.46
The Louisville Store, Harrodsburg, Ky_ 31, 519.20
The Louisville Store, Lawrenceburg, Ky_ 39, 970.38
The Louisville Store, Springfield, Ky_ 26,484. 76
The Peoples Store, Elizabethtown, Ky_ 48,731.38
The Lincoln Store, Harrodsburg, Ky_ 15, 691.32
.The Louisville Store, Princeton, Ky_ 28, 502. 27
Each corporation borrowed the entire amount necessary to acquire its opening inventory from the Liberty National Bank & Trust Company in Louisville. These loans were made after a cash flow statement was furnished to the bank. The bank loaned the money to the corporations on their unsecured notes. These notes were not guaranteed in any manner by the partnership, the partners, nor anyone.
55. The inventory loans were gradually liquidated by the corporations so that on January 31,1963, seven of the loans had been completely paid, and those remaining had been reduced to the following amounts:
The Lincoln Store, Harrodsburg, Ky_,_$12,500
The Louisville Store, Harrodsburg, Ky_■_15,000
The Peoples Store, Elizabethtown, Ky_ 15,000
The Louisville Store, Princeton, Ky_ 12,000
56. After the formation of the store corporations, the partnership furnished them buying, warehousing, and administrative services pursuant to written buying office service agreements made by the partnership with each corporation. Each corporation reimbursed the partnership for the laid-in cost of all merchandise purchased and paid a monthly service fee to the partnership for administrative services performed for it. This fee covered the corporation’s pro rata share of outlays for repairs, maintenance, insurance and property taxes on the partnership’s Louisville office and warehouse, depreciation thereon, travel and other expenses incurred in buying merchandise, and compensation to partnership employees, including the fixed monthly “salaries” of the *878 partners. Each corporation’s pro rata share of such expense was fixed at that proportion of the total expenses which its gross sales bore to the total gross sales of the store corporations and two stores (Owensboro and Winchester) operated by the partnership.
57. The buying office service agreements afforded the store corporations the benefit of buying economies secured through quantity discounts which would not have been available had each corporation undertaken separately to do its own buying and warehousing.
58. From 60 to 70 percent of the merchandise destined for the store corporations was received and warehoused at the partnership’s Louisville facility and later shipped to the store corporations in an orderly flow by common carrier. The remaining 30 to 40 percent of the merchandise was shipped by the manufacturer directly to the store corporations or drop-shipped through Louisville. This, however, represented no change in the manner of the receipt of merchandise from operations as they existed before incorporation. The partnership was a member of and used the facilities of Louisville Shippers Association, a non-profit association organized to achieve savings in freight charges. By this shipping practice the partnership saved for the store corporations from $6,000 to $9,000 annually, during the years here involved, in freight charges on merchandise shipped to Louisville.
59. The partnership received annual net profits taxable to its partners from its operations, for its taxable years 1960 through 1962 as follows:[1]
1960 _$30,816.91
1961 _ 32,607.09
1962 _ 21,956.22
60.Subsequent to the formation of the store corporations a gradual decentralization in the function of ordering, selecting and purchasing the merchandise inventories for the stores took place. Thus, before the formation of the corporations, all store inventories were acquired through the Louisville *879 buying office under the supervision of one of the partners. After the organization of the corporations the store managers commenced purchasing merchandise by placing individual orders direct with the manufacturers’ representatives. No supervision or control over such purchases was exercised by the partners. Within a short time after the formation of the corporations such purchases amounted to about 10 percent of the merchandise sold in the stores. After the formation of the corporations, the store managers selected most of that portion of their store inventories which was ordered through the partnership. The managers did not make conscious decisions as to style, size, color, price range or the like, as to basic stock items which were always on hand and which were replenished at regular intervals. Changes made in the tj^pes and lines of merchandise carried in the stores prior to the formation of the store corporations were always made by the partners — never by the store managers. After formation of the store corporations, the managers were given and have exercised authority to add new lines of merchandise to their store inventories. This has resulted not only in the carrying of new classes of merchandise by the stores (such as lawn mowers, hair dryers, typewriters, electric fans, toasters, cookers, electric can openers, electric carving knives and the like) but also in carrying merchandise of a higher quality and price within a previously carried class.
61. Since formation of the store corporations, departmental inventory records have been maintained by corporate employees in store premises. Such records were not maintained prior to incorporation.
62. Since formation of the store corporations, payments for merchandise inventories, whether made direct to an outside supplier, or by way of reimbursement to the partnership for purchases made by it on the store’s behalf, are made from a local bank account maintained in the store corporation’s name. The checks in payment, however, are issued in Louisville where the officers of each plaintiff corporation are located. Prior to the incorporations, all payments for merchandise inventories were made by the partnership from its Louisville bank account.
*880 63. Since formation of the store corporations, store managers have 'been authorized to draw checks on corporate accounts for up to $1,000 to acquire cash for cashing customers’ checks. Prior to formation of the store corporations, the partnership maintained accounts at banks located in the towns where its stores were situated, but only for the purpose of depositing daily store receipts, which would then be withdrawn by the partnership once each week.
64. Since formation of the corporations, the store managers have been given some additional authority in the marking down of prices of slow-moving merchandise. As before, however, most of the pricing functions were handled by personnel of either the partnership or the plaintiff companies at Louisville. Prior to the formation of the corporations, the store managers had no part in determining the price at which merchandise would be offered for sale.
65. Since the formation of the store corporations:
(a) Each store manager receives a monthly and yeiar-end financial statement reflecting the financial operations of his store corporation.
(b) Each store manager is the designated process agent of his corporation.
(c) Each store manager writes all radio advertising copy for his store and decides the frequency of its use, and prepares 95 percent of the newspaper advertising and arranges for its publication.
(d) Each store manager has authority and is responsible for the hiring and firing of all store corporation employees, and decides when to employ part-time workers. Prior to incorporation, a store manager could not even employ a sales clerk. Gary interviewed and approved or disapproved of each job applicant.
(e) Each store manager determines the hours which his store shall be open for business.
(f) Store managers have decided whether or not to institute credit sales in their stores. The store managers maintain all records relating to these accounts at the stores. Two store managers have decided to commence credit sales in their stores. Other store managers have decided not to start credit sales.
*881 66. Stores at Owensboro and Winchester, which the partnership was operating as of February 1,1959, were not incorporated at that time.
67. Profits from operation of the Owensboro store, which opened sometime in the 1930’s, had dropped from $19,388 for the year ended January 31, 1956, to $852 in 1958. The store showed a loss of $3,467 for the year ended January 31,1959. The store had encountered difficulties in obtaining a capable, experienced manager during this period. Besides management difficulties, competition had increased sharply during those years due to increased industrialization of the Owens-boro community, the shifting of the town’s shopping area away from where the store was located, and the construction of new highways giving shoppers ready access to stores in other towns.
68. The Winchester store, opened in 1956, incurred a loss in its first year of operation (taxable year 1957) of $1,714.33, a loss of $2,218 in 1958 and a loss of $2,431 in 1959. Keen competition was encountered by the store during this period from discount and chain stores in the nearby city of Lexington. It also experienced difficulties in obtaining a capable, experienced manager.
69. In the latter part of 1958 the partners were uncertain whether to continue the Owensboro and Winchester stores in view of their lack of financial success. The partners did not believe these stores could obtain unsecured or unguaranteed •bank loans or other independent credit to finance inventory purchases, and the operation of these stores by separate, new corporations did not square with the principle of the reorganization plan which required each store corporation to finance its own inventories. For these reasons the partners decided that these stores should not be incorporated when the other store corporations were formed.
70. After the reorganization, the Winchester store continued to operate at a loss, showing a deficit of $12,300 for 1962. In December of that year, it was closed.
71. Shortly after the reorganization, the Owensboro store was able to show a profit for 1961 of $7,086. It made a profit of $11,326 in 1962. On J anuary 1,1962, it was incorporated as The Louisville Store of Owensboro, Ky., Inc.
*882 ,72. In November 1960, the partnership purchased from each store corporation for cash at current book value such amounts of additional shares of common stock as when added to its original holdings would produce a total number of shares in each corporation evenly divisible 'by five. Immediately thereafter, the partnership distributed all its shares in each store corporation equally to its five partners.
'73. Gary died testate on December 19,1960. A bank acted as executor and trustee of his estate. Pursuant to the articles of partnership, his surviving brothers (partners) purchased in equal proportions with partnership funds, Gary’s partnership interest, and continued the partnership business. Gary’s stock in the store corporations, pursuant to the provisions of his will, was divided and transferred to the bank as trustee for the 'benefit of his wife and each of his daughters.
74. Each store corporation has since its organization separately filed state and federal payroll and unemployment tax returns, maintained separate reserve accounts for purposes of Kentucky unemployment tax requirements, and filed separate Kentucky income tax and corporate license tax returns. The partnership has never paid taxes of any kind due from any of the corporations.
75. Items of store corporation income or expense have never been shifted arbitrarily, or in any manner, from one corporation to another for purposes of increasing or decreasing corporate taxable incomes.
76. As shown in the preceding findings, there were good and sufficient business reasons for incorporating each of the plaintiff corporations.
77. On the basis of the entire record it is clear that the principal purpose of the incorporation of the plaintiff companies was the furtherance of such business reasons as detailed in the foregoing findings 'and not the securing of the $25,000 surtax exemption for each corporation. Stated conversely, the securing of the benefit of the surtax exemption, provided for in I.K.C. section 11 did not outrank or exceed in importance the business purposes, as detailed in the findings, of the incorporators of the plaintiff companies.
*883 CONCLUSION op Law
Upon tlie foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgments herein, the court concludes as a matter of law that plaintiffs are entitled to recover and judgments are entered to that effect. The amounts of recovery are reserved for determination pursuant to Eule 47 (c).
In accordance with the opinion of the court, a memorandum report of the commissioner and stipulations of the parties, it was ordered on August 4, 1967, that judgments be entered for the plaintiffs and in the amounts listed below, together with interest as provided by law:
Case No. 270-63. $7,430. 48
Oase No. 218-65. 6, 694. 73
Case No. 219-65. 2,180. 66
Case No. 220-65. 11, 683. 28
Case No. 221-65. 7,205.49
Case No. 222-65. 863. 55
Case No. 223-65. 4, 915. 22
Case No. 221-65. 6, 753. 07
Case No. 225-65. 6, 648. 76

The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

 Computed from partnership financial statements (plaintiffs’ exhibits 93-A through 93-E) by subtracting total main office expenses, exclusive of partners’ administrative “salaries” from service fees received.